UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
 )
Plaintiff, )
 )     1:12-cv-00275-SEB-TAB
vs. )
 )
CELADON TRUCKING SERVICES, INC., )
 )
Defendant. )

**Order on Cross Motions for Summary Judgment**

This cause is before the Court on the parties' cross motions for summary judgment:

Plaintiff Equal Employment Opportunity Commission's motion for partial summary judgment on

liability under 42 U.S.C. § 12112(d)(2) [Docket No. 106], filed on October 6, 2014; and

Defendant Celadon Trucking Services, Inc.'s motion for summary judgment on all claims

[Docket No. 130], filed on November 6, 2014. For the reasons set forth below, Plaintiff's motion

is GRANTED in part and DENIED in part, and Defendant's motion is GRANTED in part and

DENIED in part.

**Factual Background**

Defendant Celadon Trucking Services, Inc. ("Celadon") is an Indiana-based interstate

motor carrier company whose drivers operate throughout the United States, Mexico, and Canada.

Docket No. 108-1 (Glore Dep.), Ex. 20.[1] As an interstate carrier, Celadon is subject to various

---

[1] In order to avoid confusion between the numbering used for the parties' designated evidence and the exhibit numbers referred to within such documents, we refer to the designated evidence according to its docket number (or by title where cited repeatedly), and to attached exhibits according to the documents' own labels.

Department of Transportation (DOT) regulations, including those prescribing health and safety standards for its drivers. Among those requirements are that all drivers pass DOT-sanctioned medical examinations and otherwise possess certain minimum medical qualifications. *See* 49 C.F.R. §§ 391.41 *et seq.* As a firm with more than 15 employees, Celadon is also a "covered entity" subject to the protections of Title I of the Americans with Disabilities Act (ADA). 42 U.S.C. §§ 12111–12117.

Celadon's job application process consists of several stages. Starting in 2008 and continuing at least through 2011, that process began with an application form that, among other things, asked applicants to answer the following three "medical review" questions:

1. Have you ever been injured, hospitalized, had surgery, been treated by a doctor on an outpatient basis, currently being treated by a doctor [sic], or are you currently on any medications?

2. Have you ever been diagnosed with sleep apnea? If yes, you will need to obtain a sleep apnea form and be released by our medical department prior to attending orientation.

3. Have you ever had a heart attack, heart bypass surgery, or have had angioplasty (balloon) or stent placed? If yes, you will need to have a release from your physician and be cleared by our medical department prior to attending orientation.

Docket No. 132-2 (Chesterman Decl.), Ex. C. at 3–4; Docket No. 114-1 (Swartzlander Dep., pt. 2), Ex. 3. According to Recruiting Director David Chesterman, Celadon asked the three preliminary health questions with an eye towards the efficiency of the orientation process: "Knowing the applicants would have to disclose and/or bring releases for records pertaining to their medical histories in order to pass the DOT physical and receive a required DOT certificate,

2

Celadon asked applicants [the three questions] prior to arrival . . . so that applicants would not needlessly be sent home from orientation for failing to bring the required information." Chesterman Decl. at ¶ 7. Applicants who answered "yes" to any of these questions and disclosed medical issues were provided with a Celadon medical release form and were instructed to return completed medical releases directly to the applicant's assigned recruiter. Docket No. 108-5 (Austin Dep.) at 50–52[2]; Docket No. 108-6 (Brinkley Dep.) at 52–55. No applicants had received job offers by this point in the process. Chesterman Dep. 128; Swartzlander Dep. 71.

Once a prospective driver contacted Celadon, personnel in the company's recruiting department forwarded the applicant's information to a Celadon-employed recruiter, who performed background checks and evaluated applicants' basic qualifications. Those applicants who meet initial suitability criteria, such as an acceptable driver history and background check result, were invited to attend the next step in the process—the driver orientation program, which was conducted in Indianapolis at the company's expense. Docket No. 116-1 (Chesterman Dep.) at 44–61. Until at least 2010, as part of an "orientation check-in," recruiters called prospective drivers before their arrival and went over their responses to the application form, again asking them the three questions about their medical histories and prompting them to obtain release forms if necessary. Brinkley Dep. 43–60; Docket No. 108-7 (Johnson Dep.) at 32–40, Exs. 3–5. Despite the connotations of the term "orientation," attendees at Celadon's driver orientation

---

[2] In her deposition, Shannon Austin, a Celadon recruiter, echoed Chesterman in describing the preliminary questions and medical release requirement as being aimed at streamlining the application process from the applicant's point of view: "Anything heart or brain related we tell them make sure that you get your applicant to call our medical department or to send whatever releases they have to the medical department so the medical department can start to chew on it right away and start to work on it because those are multiple doctors that are busy." Docket No. 108-5 (Austin Dep.) at 51. She recounted that she would tell applicants arriving at orientation, if they had incorrectly answered "no" to any of the medical questions that "you need to please hurry and get this information. It is up to you [i.e. the applicant] if you want to wait for your doctor to fill it out while you are sitting in our classroom. Not usually the best plan of action." *Id.*

program had not received any offer of employment, even a conditional one. Swartzlander Dep. 69–71 (stating that Celadon recruiters told applicants only that they had an "offer to attend orientation" at this stage); Austin Dep. 88–89. On arriving at driver orientation, drivers received the following "pre-employment acknowledgment letter," calling for their signature under the following statement:

> I, [name], understand that the Orientation Program is part of the pre-employment process conducted by Celadon. I further understand that my status is "candidate for employment" and I will not become an "employee" until I have, 1.) successfully completed the Orientation Program and 2.) accepted dispatch.
>
> Additionally, I agree that attending the Orientation Program does not constitute a binding agreement between Celadon and me that will necessarily result in my employment with Celadon. I also understand that an employer/employee relationship will not exist if the above conditions are not met.

Chesterman Dep., Ex. 9; Docket No. 108-2 (Osborn Dep.), Ex. 9.

The orientation program lasted three to four days. On the first day, applicants underwent physical examinations designed to ensure that they met DOT-mandated driver health standards. Chesterman Dep. 182–185. The exams were conducted by staff from Community Health Network, who issued applicants a DOT medical certificate upon passing the medical examination. Chesterman Decl. at ¶ 10; Exs. D, E, F; Docket No. 140-1 (Hon Decl., pt. 1) at ¶¶ 2–8. Celadon required all applicants for driver positions to pass a DOT physical and receive a certification from Community Health in order to receive a job offer. Hon Decl. at ¶ 9. The orientation program included several other steps, the completion of which were all prerequisites to receiving a job offer: a road driving test, a HAZMAT film and test, a truck maintenance course, a logbook procedures class and examination, and—depending on the applicant's driver record—a defensive driving course. Osborn Dep. 46–48, 107–109, Ex. 9; Docket No. 108-4 (Perkins Dep.) at 36–38, Ex. 11. *See generally* Chesterman Dep. 182–196. The company made

4

an employment offer only after the orientation manager had certified that an applicant had completed orientation and the company's safety department had verified that the applicant's application file was complete. Chesterman Dep. 70–71, 106–107, 178–179, Ex. 10; Osborn Dep. 107–109; Perkins Dep. 36–38; Docket No. 108-3 (Steele Dep.) at 33–34, 51–56. According to Orientation Director Jessica Perkins, in 2013 Celadon began making conditional offers of employment to applicants at the beginning of orientation; employment with the company remains contingent on completing all of the orientation program's requirements, including the DOT physical exam. Perkins Dep. 30–32. The testimony of other Celadon officials, however, suggests that the company still withholds offers of any type until the conclusion of orientation. Chesterman Dep. 127–128; Osborn Dep. 46–48.

The EEOC brings this suit on behalf of two groups of applicants who sought jobs at Celadon during the period when the procedures described above were in place. The first group consists of 23 unsuccessful applicants, 22 of whom never received certifications that they had passed the required DOT physical and thus never received employment offers, and the last of whom—Jermaine Smith—passed his DOT physical but did not provide a required medical release form and was denied an employment offer on that basis.[3] See Chesterman Decl. at ¶¶ 12–15; Hon Decl. at ¶¶ 4–8; Docket No. 132-6 (Wilcher Dep.) at 101–103. The second group, a subset of the first, consists of six applicants—David Gasser, Stephen Hudetts, William Smith, Harvey Landry, Patricia Kimbrell, and Haywood Glaze—who were likewise refused employment by Celadon after Community Health personnel did not certify them as having

---

[3] The 23 class members are: Anthony Stinard, Lana Langley, Myron Henderson, Iffia Bogan, Stephen Allums, Robert Perry, Aron Griffin, Charles Shrubshall, Clifford Valley, Daniel Beavers, Darrell Fredell, Jermaine Smith, Matthew Muldrow, Travis Maddox, Michelle Baggett Davis, Dean Musselwhite, Steve Martz, David Gasser, Stephen Hudetts, William Smith, Harvey Landry, Patricia Kimbrell, and Haywood Glaze. Docket No. 132-1 (Pryzbylski Decl.) at ¶ 5.

passed their DOT physical exams. Docket No. 132-1 (Pryzbylski Decl.) at ¶ 5. The EEOC claims that these six individuals were not only subject to Celadon's policy of pre-hire medical inquiries and examinations, but were also victims of intentional employment discrimination on the basis of real or perceived disabilities.

Class member Anthony Stinard filed an EEOC charge of discrimination on April 29, 2009; additional class members filed charges thereafter. Docket No. 118-3. The EEOC issued letters of determination regarding these charges in April 2011, Docket No. 118-4, and it filed the present lawsuit on February 29, 2012.

## Legal Analysis

### Preliminary Evidentiary Dispute

As an initial matter, Celadon argues that seven of the exhibits relied upon by the EEOC in its partial motion for summary judgment are not authenticated documents and are thus inadmissible. Def.'s Br. 44.[4] In doing so, it relies upon the general rule that to be admissible, documents that a party seeks to offer into evidence must be "authenticated by and attached to an affidavit that meets the requirements of [Fed. R. Civ. Pro.] 56(e)[,] and the affiant must be a person through whom the exhibits could be admitted into evidence." *Scott v. Edinburg,* 346 F.3d 752, 760 n.7 (7th Cir. 2003) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2722, at 379–390, 382–384 (3d ed. 1998)). "There is no single way to authenticate evidence," however, and a document's "distinctive characteristics, taken in conjunction with circumstances," can permit a finding that it is authentic. *Miller v. Whipker,*

---

[4] Citations to "Def.'s Br." refer to Celadon's Combined Brief in Support of its Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Partial Summary Judgment [Docket No. 131].

2004 WL 1622212, at *4 (S.D. Ind. Mar. 31, 2004) (citing *United States v. Holmquist,* 36 F.3d

154, 167 (1st Cir. 1994)). Under Federal Rule of Evidence 901, "all that is required is a 'prima

facie showing of genuineness.'" *Id.* (quoting *United States v. Harvey,* 117 F.3d 1044, 1049 (7th

Cir. 1997)).

We agree with the EEOC that six of the seven exhibits are admissible, for one of two

reasons. First, Celadon produced four of these documents—Plaintiff's Exhibits 2, 3, 12, and

17—in discovery, thereby implicitly authenticating them. *See Miller,* 2004 WL 1622212, at *6

(citing *United States v. Lawrence,* 934 F.2d 868, 871 (7th Cir. 1991)).[5] Two more documents—

Plaintiff's Exhibits 15 and 16—are self-authenticating under Federal Rule of Evidence 902(1).

Both display the seal of the EEOC, an agency of the United States, and are signed by the

agency's district director. Docket Nos. 118-3, 118-4. *See Alexander v. CareSource,* 576 F.3d

551, 561 (6th Cir. 2009) (holding that EEOC documents signed by a team leader or agency

director and bearing the agency's seal are self-authenticating). As for Plaintiff's Exhibit 14

[Docket No. 118-2], which consists of employment history information ("DAC reports")

purportedly submitted by Celadon to HireRight, an outside firm, sufficient indicia of authenticity

are absent. The EEOC has submitted the sworn declaration of paralegal Lectric Chandler stating

that she requested the forms from HireRight on behalf of the EEOC; attached to the declaration

are HireRight's letters in response to the request. Docket No. 145-11 (Chandler Decl.) at ¶¶ 4–7.

---

[5] According to the declaration of EEOC counsel Aarika Mack-Brown, the EEOC received the documents submitted as Exhibit 2 [Docket Nos. 110–112], which are extracts from Celadon's applicant files, in response to a discovery request. *See* Docket No. 145-10 (Mack-Brown Decl.) at ¶ 8. Exhibit 12 [Docket No. 118-1] contains driver pre-employment acknowledgments, and was likewise produced by Celadon. *Id.* Mack-Brown also avers that the materials attached as Exhibit 3 [Docket No. 115], which are select pages from class member medical files, were produced in response to discovery requests on in response to a Rule 45 third-party subpoena. *Id.* at ¶ 13. The parties further dispute the admissibility of certain of the Community Health documents, and we address the issue as it arises in our main analysis. Lastly, Plaintiff's Exhibit 17 [Docket No. 118-5] is a response to a request for information produced by Celadon in discovery, printed on Celadon letterhead, and signed by Celadon's corporate counsel.

The EEOC's paralegal, however, is not in a position to authenticate the business records of a third-party organization, nor has the EEOC offered any other affidavit or means of authenticating these documents. *Cf.* Fed. R. Evid. 803(6)(D), 901. We will therefore not consider Plaintiff's Exhibit 14 in ruling on the motions for summary judgment.[6]

We consider Celadon's more specific challenges to the authenticity or admissibility of certain exhibits as necessary in the main body of our discussion.

### Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986).  The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion

---

[6] The EEOC seeks to offer its Exhibit 14, like several of the other exhibits discussed above, in support of an argument about the availability of damages that we do not reach at this stage.

for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

**Discussion**

The EEOC and Celadon have both filed motions for summary judgment. The EEOC seeks summary judgment in its favor on the issue of Celadon's liability for unlawful pre-hire inquiries and examinations in violation of 42 U.S.C. § 12112(d)(2), while Celadon moves for summary judgment in its favor on both of the EEOC's claims—unlawful pre-hire inquiries and failure to hire. Celadon also seeks summary judgment on the basis of the EEOC's failure to conciliate and on the question of the availability of punitive damages. We address these issues in turn.

**I.      Pre-Hire Inquiries and Medical Examinations**

The EEOC's first claim asserts that Celadon violated the Americans with Disabilities Act (ADA) by engaging in a "pattern or practice" of discrimination. Pl.'s Br. 11.[7] Section 107(a) of the ADA, 42 U.S.C. § 12117(a), provides a cause of action for pattern-or-practice claims, incorporating by reference Section 707 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6. As the Supreme Court has explained, "[t]he plaintiff in a pattern-or-practice suit is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 360 (1977). *See also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716–717 (7th Cir. 2012). Thus, at the liability stage of the dispute, the EEOC need not prove that "each person for whom it will ultimately seek relief was a victim of the employer's

---

[7] Citations to "Pl.'s Br." refer to EEOC's Brief in Support of its Motion for Partial Summary Judgment on Liability under 42 U.S.C. § 12112(d)" [Docket No. 107].

discriminatory policy. Its burden is to establish a prima facie case that such a policy existed." *Int'l Bhd. of Teamsters,* 431 U.S. at 360. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either "inaccurate or insignificant." *Id.*

Here, the EEOC alleges that Celadon regularly and purposefully violated the ADA's prohibitions on pre-hire medical inquiries and physical examinations related to disability. Section 102(d)(2) of the statute provides that, as a general rule, "a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability." 42 U.S.C. § 12112(d)(2)(A). Two caveats apply. First, covered entities may make pre-employment inquiries "into the ability of an applicant to perform job-related functions." *Id.* at § 12112(d)(2)(B).[8] Second, covered employers may require prospective employees to undergo medical examinations *after* they have been hired and before they commence work, if certain enumerated requirements are met. *Id.* at § 12112(d)(3).[9] The EEOC can thus prevail on its pattern-or-practice claim if it can show, by a preponderance of the evidence, that Celadon ran afoul of this statutory prohibition, and that doing so "was the company's standard operating procedure—the regular rather than the unusual practice." *Puffer,* 675 F.3d at 716 (quoting *Int'l Brotherhood of Teamsters,* 431 U.S. at 336). *See also EEOC v. Northwest Airlines,* 216 F. Supp. 2d 935, 938 (D.

---

[8] Relatedly, Section 103 of the statute states that "[i]t may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter." 42 U.S.C. § 12113(a).

[9] The requirements for post-hire medical examinations are threefold: (1) all entering employees must be subjected to the examination, regardless of disability; (2) information obtained from the examinations must be treated as a confidential medical record, with certain exceptions; and (3) the results of the examination are used in conformity with other relevant portions of the statute. 42 U.S.C. §§ 12112(d)(3)(A)–(C).

Minn. 2002) (affirming that EEOC is entitled to seek class-wide relief—without being bound by Rule 23—through its ADA enforcement powers, which in turn incorporate those of Title VII of the Civil Rights Act).

Because both parties seek summary judgment on this claim, we first will determine whether Plaintiff has made out a prima facie case that Celadon engaged in pre-offer medical inquiries and/or physical examinations. This requires us to resolve two interpretive disputes: whether a claim under § 12112(d)(2) requires that the EEOC show that class members were "otherwise qualified" individuals with disabilities, and whether the EEOC must show the existence of an "injury in fact" in order to state a claim. We then shall address Celadon's defenses: that the medical inquiries and examinations were "job-related" or were mandated by Department of Transportation regulations and thus permissible; and that four of the class members are barred from obtaining relief because they failed to disclose their claims against Celadon in their individual bankruptcy proceedings.

**A. The EEOC's prima facie case**

The EEOC alleges that, as part of its standard hiring process for drivers, at least during the years 2008–2012, Celadon made medical inquiries of its applicants and required them to submit to physical examinations before they were extended even conditional offers of employment. The company's written application form contained three health-related questions— the first of which was exceptionally broad, requiring applicants to disclose if they had *ever* "been injured, hospitalized, had surgery, been treated by a doctor on an outpatient basis, [were] currently being treated by a doctor [sic], or [were] currently on any medications." Chesterman Decl., Ex. C. at 3–4; Swartzlander Dep., pt. 2, Ex. 3. Two additional questions were narrower, focusing on sleep apnea and heart conditions. *Id.*

11

Leaving aside for the moment the question of business-relatedness, these application questions appear to be the type of open-ended inquiries that Congress sought to restrict by enacting 42 U.S.C. § 12112(d)(2). The purpose of the provision is to ensure that a prospective employee's hidden disabilities stay hidden at the pre-hire stage—which in turn helps prevent employers from using the disclosed information to screen out applicants whose hiring would entail providing an accommodation. *See Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 677 (1st Cir. 1995) (citing H.R. Rep. No. 485 (Pt. 2), 101st Cong., 2d Sess., at 73, *reprinted in* 1990 U.S.C.C.A.N. vol. 4, Leg. Hist. 303, 355)). The EEOC's enforcement guidance[10] for the statute explains that medical inquiries that are likely to elicit answers relating to disabilities are prohibited, and a blanket query seeking disclosure of any and all medical conditions runs afoul of this prohibition: "Certainly, an employer may not ask a broad question about impairments that is likely to elicit information about disability, such as 'What impairments do you have?'" EEOC, *ADA Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations* ("EEOC Enforcement Guidance") (EEOC Notice 915-002) (Oct. 10, 1995) at 8.[11] *See also Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1215–1216 (11th Cir. 2010) (discussing the "likely to elicit" standard and the enforcement guidance). Similarly, while not all questions about physical impairments are likely to elicit answers related to disabilities, open-ended inquiries about heart conditions and sleep apnea sweep broadly enough that they, too, fall within the statute's ambit. *Cf.* EEOC Enforcement Guidance at 8; *Lee v. City of Columbus,* 636 F.3d 245, 254 (6th Cir. 2011) ("Obviously, asking an employee whether he is

---

[10] We properly look to the EEOC, the agency entrusted by Congress with the enforcement of the ADA, for guidance in the interpretation of its provisions. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986) (noting that EEOC Guidelines, while "not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (quoting *Gen. Elec. Co. v. Gilbert,* 429 U.S. 125, 141–142 (1976)) (additional citations omitted); *Harrison,* 593 F.3d at 1216 n.10.

[11] Available at <www.eeoc.gov/policy/docs/medfin5.pdf> (accessed June 18, 2015).

taking prescription drugs or medication, or questions seeking information about illnesses, mental conditions, or other impairments [an employee] has or had in the past[,] trigger[s] the ADA's . . . protections.") (internal citations omitted).

Moreover, Celadon acknowledges that it required—and still requires—all applicants for long-haul truck driver positions to "pass a physical medical exam that meets requirements prescribed by the DOT." Def.'s Br. 5 (citing 49 C.F.R. § 391.43 (2014)). The Department of Transportation's regulations do indeed prescribe that long-haul truck drivers must undergo a physical examination conducted by a certified medical professional; the examinations conducted by Community Health personnel on Celadon's behalf were designed to comply with this requirement, Def.'s Br. 5, and they accordingly involved comprehensive physical examination of applicants, coupled with a number of diagnostic tests, including blood pressure tests, glucose screening, and eye and ear tests. Docket No. 108-8 (Fleming Dep.) at 7, 27–28, Ex. 51. We shall shortly address the question of whether Celadon's DOT physicals were permissible, but there is no doubt that they are "medical examinations" within the meaning of 42 U.S.C. § 12112(d)(2). *See* EEOC Enforcement Guidance, "What is a Medical Examination" at 13 (discussing factors relevant to distinguishing a medical examination from permissible tests of particular job skills).[12]

---

[12] The guidance lists the following factors as "helpful in determining whether a procedure or test is *medical*:"
- Is it administered by a health care professional or someone trained by a health care professional?
- Are the results interpreted by a health care professional or someone trained by a health care professional?
- Is it designed to reveal an impairment or physical or mental health?
- Is the employer trying to determine the applicant's physical or mental health or impairments?
- Is it invasive (for example, does it require the drawing of blood, urine, or breath)?
- Does it measure an applicant's performance of a task, *or* does it measure the applicant's physiological responses to performing the task?
- Is it normally given in a medical setting (for example, a health care professional's office)?
- Is medical equipment used?

EEOC Enforcement Guidance at 13.

Celadon does not deny that it conducted pre-employment inquiries and medical examinations. Rather, in addition to its defenses regarding the permissibility of the inquiries and examinations under the ADA, Celadon contends that the statute is inapplicable to the EEOC's claim. Celadon advances two arguments: that the prohibition set forth in 42 U.S.C. § 12112(d)(2) applies only to disabled applicants who are "otherwise qualified" for the position in question, and that a plaintiff must provide evidence that it suffered an "injury in fact" in order to state a claim. We reject both of these arguments.

### 1.  Does 42 U.S.C. § 12112(d)(2) apply only to "qualified" job applicants?

Celadon contends that the prohibitions on discriminatory conduct contained in Section 102(d)(2) of the ADA shield only "qualified individuals"—those who, "with or without reasonable accommodation, can perform the essential functions of the employment position" in question. Def.'s Br. 26. *See also* 42 U.S.C. § 12111(8) (defining "qualified individual"). The ADA does not override the safety-related requirements otherwise imposed by federal law. 29 C.F.R. § 1630.15(e) (2014) ("It may be a defense to a charge of discrimination under this part [of the ADA] that a challenged action is required or necessitated by another Federal law or regulation."). Because DOT regulations require that a long-haul truck driver receive a medical examination and certification before he or she may perform the job, 49 C.F.R. § 391.43, an applicant is therefore not "otherwise qualified" if he or she is not medically eligible to receive DOT-approved certification. *See Bay v. Cassens Transport Co.,* 212 F.3d 969, 974 (7th Cir. 2000) ("It was not until Dr. Pieper determined that Bay was qualified to drive pursuant to DOT standards that he was 'otherwise qualified' under the ADA.") (citing *Prado v. Continental Air Transp. Co.*, 982 F. Supp. 1304, 1307 (N.D. Ill. 1997)); *Cole v. Roadway Express, Inc.*, 218 F. Supp. 2d 350, 356 (W.D.N.Y. 2002) ("Once medical certification is denied . . . the transport

company may *not* hire the applicant to drive a truck on public roads without violating DOT regulations.") (emphasis added). Pointing to the fact that none of the 23 class members received DOT certifications from Community Health during orientation, *see* Hon Decl. at ¶¶ 4–8, Celadon argues that the statute does not apply.[13]

Celadon's interpretation springs from two features of Section 102's language. The first is Section 102(a), the provision's "general rule" against discrimination, which states as follows: "No covered entity shall discriminate against a *qualified individual* on the basis of disability in regard to job application procedures . . . and other terms conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). Second, the subsection on medical examinations and inquiries opens with this statement: "(1) In general – The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries." *Id.* at § 12112(d)(1). Paragraph two of the same subsection goes on to prohibit pre-employment examinations or inquiries of "job applicants." *Id.* at § 12112(d)(2)(A). On this basis, Celadon reasons that Section 102(d)'s prohibition on pre-employment inquiries and examinations implicitly incorporates the definitional limitation announced by Section 102(a)—in other words, that the only "job applicants" who may complain of improper inquiries or examinations are the "qualified individuals" that the broader statute aims to protect from discrimination.

This view finds some support in the federal courts, though it appears to be the minority position. *See Bone v. City of Louisville*, 215 F.3d 1325, at *3 (6th Cir. 2000) (unpublished table

---

[13] We address whether all or any of a subset of these 23 class members—the six failure-to-hire claimants—were "otherwise qualified" in connection with our discussion of the EEOC's failure-to-hire claim, *see infra* § II. Because we reject Celadon's interpretation of the statute, however, that factual question is not relevant to this portion of the unlawful inquiry claim.

decision) ("Since Bone has no disability, he is not eligible for the protection afforded by 42 U.S.C. § 1212(d)(2) [sic]."). *Armstrong v. Turner Indus.*, 950 F. Supp. 162, 167 (M.D. La. 1996), *aff'd,* 141 F.3d 554 (5th Cir. 1998) ("Considering the placement and purpose of the ADA restrictions on medical inquiries of job applicants found in § 12112(d) in the context of the entire statute, the most reasonable interpretation is that if a separate claim can be brought for violation of this section, it must be brought by a qualified individual with a disability . . . .").

Celadon leans, in particular, on a district court opinion from within the Seventh Circuit endorsing its preferred restrictive view of Section 102(d). In *Prado v. Continental Air Transport Co.*, 982 F. Supp. 1304 (N.D. Ill. 1997), the Northern District of Illinois granted summary judgment to a trucking company against a job applicant's claim that the company violated the ADA by subjecting him to a physical examination and refusing to hire him after he failed it. 982 F. Supp. at 1305–1306. The court did not engage in a detailed analysis of Section 102(d) and its interaction with the rest of the ADA; rather, it opened its discussion with the generalized observation that, "[t]o successfully maintain an action under the ADA, Prado must make the predicate showing that he was a 'qualified individual' for the position of driver." *Id.* at 1306 (citations omitted). Because the DOT requires long-haul truck drivers to obtain medical certification, the court found that an applicant who failed the DOT-mandated examination was not "qualified" and could not bring *any* claim under the ADA. *Id.* at 1306–1307. In a footnote, the court rejected the plaintiff's argument that Section 102(d) constitutes a *per se* prohibition on pre-hire examinations; it reasoned that such a reading of the statute would "gut" the ADA's recognition that the implementation of job standards mandated by other federal law shields an employer from ADA liability. *Id.* at 1307 n.1 (citing 42 U.S.C. § 12113; 29 C.F.R. § 1630.15(e)). In its unpublished decision in *Hunter v. Habegger Corp.*, 139 F.3d 901 (7th Cir. 1998), the

Seventh Circuit took a similar stance. Starting with the language of Section 102(a), the court reasoned that "[s]ince statutory subsections *pari materia* must be construed with reference to each other, it seems clear that in order to assert that one has been discriminated against because of an improper medical inquiry, that person must also have been otherwise qualified." 139 F.3d 901, at *13.[14]

In its more recent encounters with this issue, however, the Seventh Circuit has implicitly rejected Celadon's preferred interpretation, operating instead on the assumption that Section 102(d)(2) means what it says: employers may not require any *job applicants* to submit to medical inquiries or examinations prior to extending at least a conditional offer of employment. In *Murdock v. Washington,* 193 F.3d 510 (7th Cir. 1999), *cert. denied*, 529 U.S. 1134 (2000), while not addressing the question squarely, the court stated succinctly that, "Title I of the ADA, prohibiting disability discrimination in employment, has a section limiting medical testing for disabilities, *see* 42 U.S.C. § 12112(d)(2)–(4), and does not require that an individual be disabled to state a claim."[15] 193 F.3d at 512 (some citations omitted). In *O'Neal v. City of New Albany,* 293 F.3d 998 (7th Cir. 2002), the court offered a similarly oblique endorsement of a plain-meaning reading, mentioning with approval the consensus among several sister circuits that "in

---

[14] The *Hunter* court did not, however, explicitly foreclose the possibility that conducting pre-hire inquiries or examinations is a *per se* violation of the ADA regardless of the qualifications of the job applicant in question. In fact—confusingly, given its above-quoted statement—the court assumed that such a *per se* violation was cognizable, but it concluded that a plaintiff could not obtain *damages* without showing that he or she was otherwise qualified.

> To say that defendant was wrong in inquiring into plaintiff's worker's compensation history, however, does not in this Court['s] view mean, as plaintiff suggests, that he is entitled as a matter of law to the full spectrum of remedies including an injunction, reinstatement, back pay, front pay, attorney's fees and punitive damages. This is so because to prevail on anything other than a request for an injunction, it would have to be shown that but for the wrongful inquiry plaintiff would have been retained (or hired) as an employee.

*Hunter,* 139 F.3d 901, at *13. We address the issue of remedies below.

[15] The court went on to hold that these provisions were inapplicable to the plaintiff, who was a prison inmate rather than a job applicant or employee. 193 F.3d at 512.

general a plaintiff need not show disability to sue for medical testing violations under §

12112(d)," while noting that the Seventh Circuit itself had yet to take a definitive stand on the

issue—and declining yet again to make such a holding. 293 F.3d at 1007. *See also Hodgdon v.*

*Northwestern Univ.*, 245 F.R.D. 337, 342 (N.D. Ill. 2007) (concluding that though *O'Neal* did

not decide the issue, it had stressed that all the cases that *had* done so squarely had found an

applicant's "qualified" status relevant to remedies rather than whether he could state a prima

facie claim).

Though the Seventh Circuit has spoken enigmatically on this issue, the clear tilt of its

reasoning and the straightforward application of the principles of statutory construction compel

us to conclude that the EEOC can state a claim for a violation of Section 102(d) without

establishing that the applicants were otherwise qualified. "All statutory interpretation begins with

the language of the statute itself." *Pittway Corp. v. United States,* 102 F.3d 932, 934 (7th Cir.

1996) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)) (additional

citations omitted). In interpreting this language, we keep in mind "one of the most basic

interpretive canons": that a statute "should be construed so that effect is given to all its

provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v.*

*United States,* 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn,* 542 U.S. 88, 101 (2004)). Here,

Section 102(d)(1) announces that the statute's prohibitions on discrimination fully apply to

covered entities' use of medical examinations and inquiries; this expressly incorporates Section

102(a)'s limitation of the Act's protections to "qualified individual[s]." 42 U.S.C. §§ 12112(a),

12112(d)(1). The next paragraph, however, enacts a specific prohibition on *pre-employment*

inquiries and examination, and it explicitly restricts employers' use of such techniques with

respect to "job applicants." *Id.* at § 12112(d)(2). Section 102(d)(2), in other words, mentions

neither qualified individuals nor discrimination. The most natural interpretation of these provisions in conjunction is that "job applicants" means something different—something broader, in fact—than "qualified individuals." *See Fredenburg v. Contra Costa Cnty. Dep't of Health Servs.*, 172 F.3d 1176, 1182 (9th Cir. 1999). This reading not only gives effect to Congress's decision to use distinct terminology in distinct provisions of the statute, but it also avoids reading Section 102(d)(2) as a nullity, a mere restatement of the paragraph preceding it. As other courts have recognized, available evidence of congressional intent is consistent with the notion that the prohibition on pre-employment inquiries and examinations was enacted as a broad, prophylactic measure. S*ee Harrison,* 593 F.3d at 1213–1214 (citing H.R. Rep. No. 101–485, pt. 2, at 1); *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594 (10th Cir. 1998), *cert. denied,* 526 U.S. 1065 (1999) ("The legislative history of the ADA indicates that Congress wished to curtail all questioning that would serve to identify and exclude persons with disabilities from consideration for employment.").

   We therefore conclude that the EEOC need not establish that the job applicants who were subjected to pre-employment inquiries and examinations were "otherwise qualified" in order to state a claim that Celadon violated 42 U.S.C. § 12112(d)(2). As the Seventh Circuit has recognized, this result is in accord with a majority of circuit courts to have considered the question. *O'Neal,* 293 F.3d at 1007. *See Fredenburg,* 172 F.3d at 1182; *Griffin*, 160 F.3d 591 at 593–595; *Cossette v. Minn. Power & Light,* 188 F.3d 964, 969–970 (8th Cir. 1999). *But see Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 516–517 (3d Cir. 2001) (determining that "it is not clear from the text of the ADA itself whether nondisabled individuals are permitted to sue for violations of § 12112" and declining to decide the question).

   **2. "Injury-in-fact"**

Celadon argues in the alternative that, even if 42 U.S.C. § 12112(d)(2) applies to all job applicants, the EEOC has not stated a claim here because it cannot demonstrate that any of the class members suffered an "injury-in-fact" as a result of the allegedly unlawful inquiries and examinations. Def.'s Br. 29–30.

It is true that an individual plaintiff cannot recover damages on an unlawful inquiry claim without demonstrating that she suffered a tangible harm resulting from the company's conduct. *Strong v. Paulson,* 249 Fed. App'x 470, 473 (7th Cir. 2007) ("To prove a violation under 42 U.S.C. § 12112(d)(2), a plaintiff must demonstrate that he suffered some tangible injury-in-fact."); *O'Neal,* 293 F.3d at 1007–1008 (Collecting cases from sister circuits and noting that, "[i]n all of these cases . . . the courts have required that a nondisabled plaintiff *at least* show some tangible injury-in-fact caused by the § 12112(d) violation") (emphasis original). Again, as the Seventh Circuit in *Hunter* explained:

> To say that defendant was wrong in inquiring into plaintiff's worker's compensation history, however, does not in this Court['s] view mean, as plaintiff suggests, that he is entitled as a matter of law to the full spectrum of remedies including an injunction, reinstatement, back pay, front pay, attorney's fees and punitive damages. This is so because to prevail on anything other than a request for an injunction, it would have to be shown that but for the wrongful inquiry plaintiff would have been retained (or hired) as an employee.

139 F.3d 901, at *13. *See also Chi. Reg'l Council of Carpenters v. Thorne Assocs., Inc.*, 893 F. Supp. 2d 952, 957–958 (N.D. Ill. 2012) (holding that where an applicant *passed* the challenged examination, he had demonstrated no injury and thus lacked standing to challenge the company's practices).

The EEOC, however, is situated differently than an individual plaintiff.  The Supreme Court explained in *EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002), that there are several

20

respects in which the agency does not "stand in the shoes" of the individual claimants on whose

behalf it brings claims. 534 U.S. at 297–298. As the Court stated in relation to the analogous

enforcement provision of Title VII, the EEOC's standing to bring a suit challenging a violation

of the ADA is not derivative of the class members' personal claims; it stems directly from the

statute, and the EEOC's own statutory enforcement authority. *See Gen. Tel. Co. of the Nw., Inc.*

*v. EEOC,* 446 U.S. 318, 324 (1980). *See also Occidental Life Ins. Co. of Cal. v. EEOC,* 432 U.S.

355, 368 (1977) ("The EEOC does not function simply as a vehicle for conducting litigation on

behalf of private parties . . . .").

We thus agree with the EEOC that the agency suffers an "injury" sufficient to give rise

to Article III standing when a violation of Section 102 of the ADA occurs. *See Stauffer v. Brooks*

*Brothers, Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010) ("Congress has, by enacting [35 U.S.C.

292, prohibiting false marking in patents] defined an injury in fact to the United States. In other

words, a violation of that statute inherently constitutes an injury to the United States. . . . The

parties have not cited any case in which the government has been denied standing to enforce its

own law."). *EEOC v. Grane Healthcare Co.*, 2 F. Supp. 3d 667, 681 (W.D. Pa. 2014) ("A

violation of § 12112(d) occurs as soon as an employer conducts an unlawful medical

examination or initiates a prohibited medical inquiry.") (citing *Katz v. Adecco USA, Inc.,* 845 F.

Supp. 2d 539, 545 n.7 (S.D.N.Y. 2012)).  The EEOC has therefore stated a sufficient prima facie

case at the liability stage so long as the availability of some form of relief—whether an

injunction or money damages—renders the violation redressable. *Cf. Vt. Agency of Natural Res.*

*v. United States ex rel. Stevens,* 529 U.S. 765, 771 (2000).[16]

---

[16] There is no question here as to causation.

With respect to injunctive relief, Celadon argues that the matter is moot because the company has ceased engaging in pre-hire examinations. It bases this assertion on the declaration of Celadon Recruiting Director David Chesterman, who avers that, since 2013, Celadon grants applicants conditional offers of employment before requiring them to undergo DOT physicals to secure a final offer. Chesterman Decl. at ¶ 9. *See also* Perkins Dep. 30–32. The EEOC disputes this, and the designated evidence—including Chesterman's own deposition—creates a genuine issue of material fact with respect to the company's current practice. *See* Chesterman Dep. 127–128 ("What I consider their hire point is they completed orientation, drug test, road test, a physical, all those things have been met."). Chesterman testified explicitly that, at present, applicants are not "told at any point in time when they get to orientation or during orientation that they have an offer of employment at Celadon[.]" *Id. See also* Osborn Dep. 46–48 (acknowledging that, at present, the company informs applicants upon arrival to orientation that they will not receive offers until completing the orientation process); Osborn Dep., Ex. 9.  The EEOC does not dispute that Celadon ceased asking the disputed three application questions by 2012. *See* Pl.'s Br. 5 n.2. We leave the resolution of this factual dispute to a later stage in the litigation, but we note that injunctive relief may be available to redress any violations of the statute that are ongoing—or, if halted, are susceptible of being repeated. *See generally Nelson v. Miller,* 570 F.3d 868, 882 (7th Cir. 2009) ("It is well established that a defendant's voluntary cessation of a challenged practice does not necessarily moot a case.").

In addressing the question of liability, we need not discuss the amount of damages the EEOC may be entitled to recover; the EEOC has suffered an "injury-in-fact" regardless of the availability of damages for the individual class members. Celadon nonetheless seeks summary judgment on the question of damages, urging that we declare now that because none of the class

members can show that they suffered any tangible injury, damages are foreclosed as a matter of law. As we discuss in Section II of this Order, however, the EEOC has designated evidence sufficient to create a factual dispute with respect to the denial of DOT certification to some of the class members; because some of the class members—including some of the failure-to-hire claimants—may be able to demonstrate that they were, in fact, "otherwise qualified," damages could be predicated on their injury in being denied employment. *Cf. Strong v. Paulson,* 249 Fed. App'x at 473. An issue of fact therefore remains regarding the availability of damages as well as the amount(s).

## B. Celadon's "job-related" defense for its medical inquiries

Celadon argues that, even if 42 U.S.C. § 12112(d)(2) applies to the EEOC's claim, the medical questions that Celadon asked its job applicants fit within the safe harbor for "job-related" inquiries provided by the statute. "In sum, the alleged 'medical inquir[i]es' at issue in this case all were directly related to the applicants' ability to secure DOT medical certifications as well as their ability to safely drive Celadon trucks." Def.'s Br. 22.

The statute provides that, notwithstanding the general prohibition on pre-employment inquiries and medical examinations related to applicants' disabled status, a "covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions." 42 U.S.C. § 12112(d)(2)(B).[17] A prospective employer may therefore "make pre-employment

---

[17] Celadon also relies on two other portions of the ADA that recognize exceptions to the general rule for purposes of job-relatedness or "business necessity." In elaborating on the definition of "discrimination" as employed in Section 102, the statute states that discrimination may include "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities *unless* the standard, test or other selection criteria, as used by the covered entity, is shown to be *job-related for the position in question and is consistent with business necessity*." 42 U.S.C. § 12112(b)(6) (emphasis added). As we have discussed above, we read the prohibition on pre-employment inquiries in Section 102(d)(2) as distinct from Section 102's general prohibition on "discrimination." While the exceptions for "job-relatedness" overlap each other, we determine that 42 U.S.C. § 12112(d)(2)(B) provides the relevant safe harbor, if any, for

inquiries into the ability of an applicant to perform job-related functions, and/or may ask an applicant to describe or demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions." 29 C.F.R. § 1630.14(a). The prohibition on pre-employment inquiries was "designed to completely take the medical element out of the pre-offer stages of employment," and the exception for job-related inquiries is therefore construed narrowly. *Green v. Joy Cone Co.*, 278 F. Supp. 2d 526, 540 (W.D. Pa. 2003), *aff'd* 107 Fed. App'x 278 (3d Cir. 2004). An employer may ask, for instance, "if an individual can perform the *essential* functions of the job if it is visibly unclear whether the person would be physically unable to do so." *Id.* (emphasis original).

Here, as Celadon points out, the contours of the long-haul truck driver position's physical standards are defined in part by binding Department of Transportation regulations. *See* 49 U.S.C. § 31144(a) (granting the Secretary of Transportation authority to prescribe driver qualifications). Specifically, the regulations state that a driver must have full use of all limbs, possess a minimum level of visual and hearing acuity, and be free of the following: diabetes mellitus; certain diagnosed severe heart or respiratory dysfunctions; high blood pressure likely to interfere with safe operation; any "established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease" interfering with safe operation; epilepsy or other disease likely to cause sudden loss of consciousness; severe psychiatric disorders; drug abuse; and alcoholism. *See* 49 C.F.R. § 391.41(b).

---

Celadon's conduct. The second additional portion cited by Celadon is 42 U.S.C. § 12112(d)(3), which allows covered entities to require medical examinations *after* giving applicants conditional offers of employment. This serves as an explicit exception to the rule announced in § 12112(d)(2), and we discuss it below in connection with Celadon's contention that its medical examinations were permissible.

Celadon therefore asserts that the questions it asked applicants about their medical conditions were permissible, because they related to the DOT's exacting physical qualifications for the position.  We find that Celadon has made an adequate showing with respect to the second and third medical history questions on its application form—those delving into sleep apnea and heart conditions, respectively. The inquiry into heart conditions, Celadon says, proceeded directly from the requirement that drivers have "no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure." 49 C.F.R. § 391.41(b)(4). While sleep apnea, the subject of the second of Celadon's questions, is not specifically covered in the DOT regulations, Celadon points to remarks by the Administrator of the Federal Motor Carrier Safety Administration that, because fatigue is "among . . . high risk behaviors and sleep apnea is a condition that contributes to fatigue," the DOT "encourage[s] carriers to screen their drivers" for the condition. *See* Def.'s Br. 22 (citing *Remarks for the Sleep Apnea and Trucking Conference,* May 11, 2010, FMCSA Director).[18] Celadon's first inquiry, however, exceeded even the extensive scope of the DOT driver qualifications. It asked: "Have you even been injured, hospitalized, had surgery, been treated by a doctor on an outpatient basis, currently being treated by a doctor [sic], or are you currently on any medications?" Chesterman Decl., Ex. C. at 3–4; Swartzlander Dep., Ex. 3. Plainly, this question swept in a great deal of information not directly relevant to an applicant's ability to perform the job—and it thus ran afoul of the statute's prohibition on employers' using pre-hire inquiries as a broad-based device to screen for potential disabilities. *See Harrison,* 593

---

[18] The text is available at http://www.fmcsa.dot.gov/newsroom/remarks-sleep-apnea-and-trucking-conference (accessed June 22, 2015). We take judicial notice of the contents of the website of a U.S. Government agency. *See Denius v. Dunlap,* 330 F.3d 919, 926 (7th Cir. 2003).

F.3d at 1215; *Green,* 278 F. Supp. 2d at 540 (describing Section 102(d)(2)'s "prophylactic" purpose).[19]

Celadon does not substantiate its claim that such a global inquiry into an applicant's health history is a necessary outgrowth of the DOT occupational health requirements. The closest it comes is to cite a decision of the Southern District of Texas that it describes as "on all fours" with the facts of this case. In *EEOC v. Texas Bus Lines,* 923 F. Supp. 965 (S.D. Tex. 1996), the court determined that an application form requiring applicants to "list any physical defects such as eyesight, hearing, limb impairment, diabetes, back or heart trouble, high blood pressure, fits, convulsions, fainting, etc." fell within the exception for job-related inquiries. 923 F. Supp. at 981. The court reasoned as follows:

> [T]he general "physical defect" inquiry does not violate the ADA. The basic medical inquiries made by Texas Bus Lines are reasonably related to the position of bus driver. Physical defects such as eyesight, hearing, limb impairment, diabetes, back or heart trouble, high blood pressure, fits, convulsions, fainting, etc., in light of the requirements of the bus driver position, are relevant job-related inquiries and are consistent with business necessity. Moreover, Texas Bus Lines specifically delineates those "physical defects" set forth in the DOT instructions to the examining health care professional. *See* 49 C.F.R. § 391.43(e). For the foregoing reasons, the Court finds that Texas Bus Lines' pre-offer, pre-employment medical inquiries do not constitute a per se violation of the ADA.

*Id.* Whatever *Texas Bus Lines'* persuasiveness, it is decidedly not on "all fours" with the facts before us. Celadon's application inquiry did not "specifically delineate" the physical defects

___

[19] Celadon's medical release policy, announced to applicants in the lead-up to orientation and triggered by affirmative responses to any of the application questions, is also broad. Unlike the first application question, however, some of the required releases— those pertaining to brain or heart surgeries, concussions, antidepressant prescriptions, and any history of seizures or neurological conditions—are at least tailored to the concerns expressed in the DOT regulations. *See* Fleming Dep. 70–82, Ex. 16. The mandate for medical releases related to *all* surgeries within the last year and all orthopedic surgeries in the last 5 years, however, does not relate to any specific DOT requirement. *Cf.* 49 C.F.R. § 391.41; *id.* at 72–74. The parties focus their attention primarily on the application questions rather than the disclosure and release requirements, but we find that these two release requirements violate Section 102(d)(2)—and are not subject to the job-relatedness safe harbor—for the same reason as the first application question.

about which it was seeking information; rather, it required an applicant to list *all* medical issues and *all* medications. An inquiry analogous to that before the court in *Texas Bus Lines*—one that paired a general inquiry into "physical defects" with a (somewhat) narrower laundry list of conditions related to the DOT requirements—would present a closer question, but the question asked by Celadon here could hardly be less tailored.

In defending its application inquiries, Celadon repeatedly returns to a foundational point of law: that the ADA may be limited by the application of other federal laws and regulations, such as those health and safety standards promulgated by the DOT. *See* Def.'s Br. 1 ("Safety. That one word sums up the essence of this case."). *See also* Def.'s Br. 24–25; Def.'s Reply 25–30. It is true enough that "the DOT regulations limit the application of the ADA as a matter of law." *Gaspar v. DS Waters of Am.*, 2013 WL 2355994, at *5 (N.D. Ill. May 22, 2013), *appeal docketed,* No. 13-2370 (7th Cir. June 24, 2013) (citing *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 573 (1999)). *See also* 29 C.F.R. § 1630.15(e) (2014) ("It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation."). Requirements imposed by the DOT are inherently "job-related," and Celadon therefore bears no obligation to make a separate showing that inquiries into an applicant's ability to comply with those requirements is permissible. *See* Def.'s Ex. 21 (EEOC Technical Assistance Manual: Title I of the ADA, at § 4.6 (Jan. 1992)) ("If a standard is required by another federal law, an employer must comply with it and does not have to show that the standard is job related and consistent with business necessity."). But in falling back on these truths—none of which the EEOC contradicts—Celadon has missed a key step in its argument: showing a nexus between the inquiries it *actually* made and the undeniably important safety regulations under which it is obliged to operate for the public good. We hold that Celadon has

created no genuine dispute of fact regarding the "job-relatedness" of the first of the three medical history questions on Celadon's application or the related medical release requirements, and we therefore reject Celadon's effort to withstand summary judgment for the EEOC on the basis of 42 U.S.C. § 12112(d)(2)(B)'s safe harbor provision. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007) (noting that employer bears the burden of establishing job-relatedness or the related "business necessity" defense); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 699 (7th Cir. 1998).

### C. Celadon's defense of its medical examination policy

Celadon likewise argues that the medical examinations it required its applicants to undergo at orientation were permissible, because they were necessary to ensure the company's compliance with DOT regulations.

On its face, Section 102(d) prohibits pre-offer medical examinations entirely; while it permits job-related *inquiries,* it makes no such exception for examinations. 42 U.S.C. § 12112(d)(2)(B). ADA Section 103, however, recognizes a defense for employers where examinations or other criteria are driven by business necessity: "It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113(a). Federal regulations, as we have already noted, establish the same principle. *See* 29 C.F.R. § 1630.15(e). On the strength of these provisions, Celadon argues that it cannot be held liable for requiring its applicants to undergo examinations to obtain the certifications required by federal law.

Once again, Celadon omits a critical analytical step: it fails to explain how subjecting applicants to medical examinations *before* they receive a conditional offer is a function of business necessity. As it does elsewhere, Celadon relies on the Northern District of Illinois's decision in *Prado v. Continental Air Transport Co., Inc.,* 982 F. Supp. 1304 (N.D. Ill. 1997). In a footnote, the court there considered, and rejected, the notion that Section 102(d)(2) categorically forbids employers from requiring medical examinations before granting conditional employment offers:

> Prado argues that Continental committed a per se violation of the ADA by requiring him to undergo a medical exam before making a conditional offer of employment. *See* 42 U.S.C. § 12112(d)(3) (forbidding medical examinations prior to conditional offer of employment). However, 42 U.S.C. § 12113 and 29 C.F.R. § 1630.15(e), render Prado's assertion meritless. The foregoing provisions recognize that medical or physical examinations are sometimes necessary to determine if an applicant meets the minimum qualifications necessary for employment. To adopt Prado's position would gut the protections provided to employers under 42 U.S.C. § 12113 and 29 C.F.R. § 1630.15(e).

982 F. Supp. at 1307 n.1.

In our view, the *Prado* decision relies on a misreading of the statute, which, properly construed, works hand-in-glove with the DOT's occupational requirements and the need for thorough medical vetting of employees. Section 102(d)(3), which immediately follows the ban on pre-employment examinations, states that covered entities *are* permitted to "require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination." 42 U.S.C. § 12112(d)(3). If conducting examinations, employers must impose them on a uniform basis regardless of disability, and they must safeguard the medical privacy of the examinees. *Id.* at §§ 12112(d)(3)(A)–(C). As EEOC guidance makes clear, the combination of these provisions does not "gut" DOT regulations; it merely channels them into the post-offer, pre-employment phase of the hiring process: "The

29

ADA recognizes that employers may need to conduct medical examinations to determine if an applicant can perform certain jobs effectively and safely. The ADA requires only that such examinations be conducted as a separate, second step of the examination process, after an individual has met all other job prerequisites." EEOC Technical Assistance Manual, § 6.4 (Jan. 1992). *See also* EEOC Informal Discussion Letter, "ADA: Post-Offer, Pre-Employment Medical Exams" (Feb. 26, 2009) ("In most instances, an employer may not ask applicants disability-related questions or require them to undergo medical examinations before a job offer is made. Once the employer has obtained and evaluated all non-medical information and has made a 'real offer' of employment, it may require all entering employees in the same job category to . . . submit to medical examinations.").[20]

Although it did not reach a holding on the question, the Seventh Circuit in *O'Neal* observed that, "under § 12112(d)(2), the defendants probably could not have required O'Neal to take [PERF-required medical examinations] until after they gave him [a] conditional offer." 293 F.3d at 1009. Other courts have found the ban on pre-hire examinations to be applicable even when the examinations were required pursuant to DOT regulations. *See Toole v. Metal Servs., LLC,* 2014 WL 1760955, at *12–13 (S.D. Ala. May 2, 2014) (construing § 12112(d)(2) as categorically forbidding pre-offer examinations, but finding plaintiff was at the post-offer, pre-employment stage); *Laurent v. G & G Bus Serv., Inc.*, 2013 WL 5354733, at *4 (S.D.N.Y. Sept. 25, 2013) (holding that a pre-offer examination violates the statute). *See also Denton v. Chi. Transit Auth.*, 2010 WL 1922771, at *5–7 (N.D. Ill. May 6, 2010), *aff'd* 400 Fed. App'x 90 (7th Cir. 2010) (assuming that Section 102(d)(2) would prohibit pre-offer DOT examinations, but

---

[20] Available at <http://www.eeoc.gov/eeoc/foia/letters/2009/ada_postoffer_preemployexams.html> (accessed June 29, 2015).

finding the plaintiff to be an employee, not a pre-hire applicant). Since the ADA itself provides a

clear avenue for employers to conduct required medical examinations after conditional offers,

there is no conflict between Section 102(d)(2) and the DOT regulations upon which Celadon

justifies its policy. We conclude that the ADA means what it says, and that pre-offer medical

examinations—like the ones concededly required by Celadon of its applicants—violate the

statute. Celadon's "business necessity" defense is thus unavailing.

**D. Four class members' failure to disclose their respective ADA claims in bankruptcy**

Celadon contends that four of the class members for whom the EEOC brings its unlawful

inquiry claim—Aron Griffin, David Gasser, Steve Martz, and Iffia Bogan—failed to disclose

their claims against Celadon in their personal bankruptcy proceedings, thereby foreclosing the

EEOC from pursuing those claims on their behalf. If Celadon were to prevail on this defense, it

would undermine only the EEOC's ability to collect damages on behalf of those four claimants,

leaving the unlawful inquiry claim on behalf of the other 19 class members unaffected.[21]

Under the federal bankruptcy code, a debtor must schedule as assets "all legal or

equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §

541(a)(1). Causes of action which the debtor acquires while the bankruptcy is pending are also

considered property of the bankruptcy estate. 11 U.S.C. § 1306(a)(1); *Cowling v. Rolls Royce

Corp.*, 2012 WL 4762143, at *3 (S.D. Ind. Oct. 5, 2012). This obligation applies to both Chapter

7 and Chapter 13 bankruptcies. *See Rainey v. United Parcel Serv., Inc.*, 466 Fed. App'x 542, 544

(7th Cir. 2012); *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1274 (11th Cir. 2010). Because

---

[21] David Gasser is also one of the six failure-to-hire claimants. Our determination that the EEOC is not estopped
from bringing claims based on legal violations he suffered applies to the failure-to-hire claim as well as the unlawful
inquiry claim.

the bankruptcy estate, not the debtor, owns the claim, a debtor lacks standing to pursue an undisclosed claim on the estate's behalf during the pendency of the bankruptcy. *Cowling,* 2012 WL 4762143, at *5.

Even after the bankruptcy is closed, the doctrine of judicial estoppel will often bar a would-be claimant from pursuing a cause of action that she failed to disclose in bankruptcy. "A debtor who fails to disclose 'an asset, including a chose in action or other legal claim, cannot realize on that concealed asset after the bankruptcy ends.'" *Becker v. Verizon North, Inc.*, 2007 WL 1224039, at *1 (7th Cir. Apr. 25, 2007) (quoting *Cannon-Stokes v. Potter,* 453 F.3d 446, 448 (7th Cir. 2006)); *accord Biesek v. Soo Line R.R. Co.*, 440 F.3d 410, 412–414 (7th Cir. 2006). Claimants Griffin, Gasser, Martz, and Bogan all underwent at least one bankruptcy proceeding, and all accrued their present claims against Celadon before their bankruptcies closed. *See* Def.'s Exs. 10–17. But the EEOC, not those four individuals, has brought this claim—and as we have already noted, the distinction is not a trivial one. The parties' dispute here centers on whether judicial estoppel applies where the EEOC sues on a claim previously undisclosed by individual charging parties in bankruptcy proceedings.

Judicial estoppel is "an equitable concept providing that a party who prevails on one ground in a lawsuit may not . . . in another lawsuit repudiate that ground." *See Johnson v. Exxon Mobil Corp.*, 426 F.3d 887, 891 (7th Cir. 2005) (quoting *United States v. Hook,* 195 F.3d 299, 306 (7th Cir. 1999)). As enunciated by the Supreme Court, several factors govern the doctrine's application. *See generally New Hampshire v. Maine,* 532 U.S. 742, 750 (2001). First, the party in question must take a factual position that is clearly inconsistent with one it earlier took before a court. *New Hampshire,* 532 U.S. at 750. Second, the party to be estopped must have succeeded in persuading a court to accept that party's earlier position—such that a court's acceptance of the

new position would create the impression that one or the other of the courts had been misled. *Id.*; *EEOC v. Autozone, Inc.*, 2009 WL 464574, at *2 (C.D. Ill. Feb. 23, 2009). Lastly, the court must consider whether the party to be estopped would derive an unfair advantage from its inconsistent positions. *New Hampshire,* 532 U.S. at 751.

We conclude that judicial estoppel does not apply to the EEOC here because the agency, in fulfilling its enforcement role, does not merely stand in the shoes of individual claimants; in other words, it is not the same "party" that earlier took an inconsistent position before a court. The EEOC is not "merely a proxy for the victims of discrimination," *Gen. Tel. Co.*, 446 U.S. at 326; nor does it sue "as the representative of the discriminated-against employee." *In re Bemis,* 279 F.3d 419, 421–422 (7th Cir. 2002) ("The EEOC's primary role is that of a law enforcement agency and it is merely a detail that it pays over any monetary relief obtained to the victims of the defendant's violation rather than pocketing the money itself."). Rather, the ADA makes the EEOC the "master of its own case," and confers upon the agency independent authority to evaluate the strength of the public interests at stake in enforcing the statute. *Waffle House,* 534 U.S. at 291.

The Seventh Circuit has not addressed this proposed application of judicial estoppel directly, but its analysis in *EEOC v. Sidley Austin LLP*, 437 F.3d 695 (7th Cir. 2006), is instructive. There, the defendant claimed that because a suit by the individuals alleging discrimination would have been barred by an arbitration clause, the EEOC was likewise barred from seeking relief. The court rejected that argument: "The reason there was no bar was not that the arbitration clause was unenforceable but that the Commission was not bound by it because its enforcement authority is not derivative of the legal rights of individuals even when it is seeking to make them whole." 437 F.3d at 696.

Applying similar reasoning, several courts considering the question before us have determined that applying judicial estoppel to the EEOC is inconsistent with the equitable purposes of the doctrine and improperly constricts the agency's enforcement authority. *See EEOC v. Autozone, Inc.*, 2009 WL 464574, at *4–5 (C.D. Ill. Feb. 23, 2009) (citing *Sidley Austin*, and concluding that "[n]arrowing [the EEOC's] interest by placing on it the same boundaries that limit individual litigants would be ill advised"); *EEOC v. Tobacco Superstores, Inc.*, 2008 WL 2328330, at *8 (E.D. Ark. June 4, 2008) ("Since the class members did not file this action, they are not a party to this action, and they have no control over the EEOC's decision to bring this action, I will not expand the doctrine of judicial estoppel to hold that the class members abused the judicial process . . . ."); *EEOC v. Digital Connections, Inc.*, 2006 WL 2792219, at *3 (M.D. Tenn. Sept. 26, 2006) ("The fact remains, however, that the EEOC, as the plaintiff party, decided to bring this lawsuit . . . . Shelley did not file the action, she is not a party to it, and she did not control the EEOC's decision to bring the action."); *EEOC v. Apria Healthcare Grp., Inc.*, 222 F.R.D. 608, 613 (E.D. Mo. 2004). *But see EEOC v. Dave's Detailing, Inc.*, 2008 WL 1968315, at *3 (W.D. Ky. May 2, 2008) (applying equitable estoppel to the EEOC in light of individual claimants' failure to disclose claims in bankruptcy).[22]

The EEOC was not a party to the four individual claimants' bankruptcy proceedings, and those four individuals are not parties to the EEOC's present action to enforce the ADA's

---

[22] *Dave's Detailing,* the primary judicial decision Celadon cites in support of its argument, applied estoppel primarily on the grounds that, since the individual claimants would ultimately receive the money damages recovered in the EEOC's action, equity dictated that they should not profit from their earlier inconsistent positions. 2008 WL 1968315, at *3. We find this reasoning unpersuasive, in large part because it plainly contradicts the Seventh Circuit's statement on an analogous question. In affirming that the EEOC does not stand in the shoes of a party class representative for purposes of Rule 23, the court explained: "The EEOC's primary role is that of a law enforcement agency and it is merely a detail that it [the EEOC] pays over any monetary relief obtained to the victims of the defendant's violation rather than pocketing the money itself and putting them to the bother of suing separately." *In re Bemis,* 279 F.3d at 421.

prohibitions on pre-employment medical inquiries and examinations. We therefore conclude that judicial estoppel does not bar the EEOC from recovering damages predicated on harms they may have suffered.[23]

**E. Conclusion**

We have found that the EEOC has stated a prima facie case that Celadon engaged in pre-hire medical inquiries and examinations in violation of 42 U.S.C. § 12112(d)(2). *See Int'l Bhd. of Teamsters,* 431 U.S. at 360. Celadon has succeeded in showing that two of the three application questions—and some of the company's medical release requirements—are "job-related" and thus permissible. *See* 42 U.S.C. § 12112(d)(2)(B). The first, most open-ended application question, however, is not subject to such a defense; neither are the medical release policy's requirements that applicants disclose and obtain medical releases for all orthopedic surgeries in the past five years and *all* surgeries of any type in the past year. Chesterman Decl., Ex. C. at 3–4; Swartzlander Dep. Ex. 3; Fleming Dep. 70–82, Ex. 16. In no other respect does Celadon establish the existence of a genuine issue of material fact as to the EEOC's prima facie case, meet its burden with respect to an affirmative defense, or substantiate any of its arguments that the EEOC is not entitled to relief as a matter of law.

The EEOC's motion for summary judgment on its unlawful inquiry or examination claim under 42 U.S.C. § 12112(d)(2) is therefore GRANTED in part, and we DECLARE that Celadon's pre-offer medical examination requirement, the first medical question on its application form, and its non-tailored surgery medical release requirements violate the

---

[23] As of Celadon's November 6, 2014 cross motion for summary judgment, Iffia Bogan's bankruptcy in the Middle District of Alabama remained open. *See* Def.'s Ex. 14. While he would thus lack standing to initiate an employment discrimination case on his own behalf during the pendency of his bankruptcy, *see Cowling,* 2012 WL 4762143, at *4, the EEOC faces no such standing barrier, for the reasons we have already discussed.

Americans with Disabilities Act. The EEOC's motion for summary judgment is DENIED in part—and Celadon's cross motion for summary judgment is correspondingly GRANTED in part—with respect to the other features of Celadon's application process. Celadon's motion for summary judgment is DENIED in all other respects. We will address the issue of remedies for this violation at a later stage of the litigation. *Int'l Bhd. of Teamsters,* 431 U.S. at 361.

## II.      Failure to Hire

The EEOC's second claim asserts that Celadon discriminated against six applicants on the basis of disability by failing to hire them for truck driver positions, in violation of 42 U.S.C. § 12112(a). The EEOC brings this claim under Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)—the provision granting the EEOC or individual plaintiffs a cause of action for discriminatory employment actions. In this type of action, the EEOC may request injunctive or monetary "relief for a group of aggrieved individuals." *EEOC v. Original Honeybaked Ham Co. of Ga., Inc.*, 918 F. Supp. 2d 1171, 1176 (D. Col. 2013) (citing *Gen. Tel. Co.,* 446 U.S. at 324). In contrast to a pattern-or-practice claim, then, the EEOC here must prove the elements of a failure-to-hire claim as to each individual for whom it seeks relief. *See EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 929 (N.D. Iowa 2009) ("[I]t is axiomatic that the EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all the elements of their . . . claims to obtain individual relief for them."). *See also EEOC v. Carolls Corp.*, 2011 WL 817516, at *2 (N.D.N.Y. Mar. 2, 2011).

To prevail on a failure-to-hire claim, a plaintiff must show that: (1) she is a disabled person within the meaning of the ADA; (2) she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) the employer failed to hire her for

36

the position under circumstances which give rise to an inference that the failure to hire was based on her disability. *Winsley v. Cook County,* 563 F.3d 598, 603 (7th Cir. 2009); *Thompson v. Advance/Newhouse P'ship,* 2007 WL 2713127, at *3 (S.D. Ind. Sept. 13, 2007) (citing *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). A plaintiff may establish that the failure to hire was discriminatory by either "direct" or "indirect" methods of proof. *Dickerson v. Bd. of Trs. Of Cmty. Coll. Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011).

Under the "direct" method, the plaintiff can present either a direct admission of discriminatory intent (an unlikely occurrence) or a compelling mosaic of circumstantial evidence of animus—such as suspicious timing, ambiguous statements or behavior towards other disabled employees, evidence that non-disabled employees systematically receive better treatment, or evidence that the employer offered a pretextual reason for the failure to hire. *Id.*; *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586–587 (7th Cir. 2011). The "indirect" method employs the familiar *McDonnell Douglas* burden-shifting scheme. First, the plaintiff must build a prima facie case by showing that: he applied for an open position that he was qualified to perform; he was rejected for it; and the position was filled by a person outside the protected class. *Grigsby v. LaHood,* 628 F.3d 354, 358–359 (7th Cir. 2010). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for not hiring the plaintiff—after which it is again the plaintiff's burden to demonstrate that the stated reason is pretext. *Id.* at 359.

Celadon argues that the EEOC has failed to substantiate its claim in two respects: it has not provided evidence that the six applicants were qualified for the trucker driver position by virtue of DOT medical certification, and it has failed to show that Celadon's non-discriminatory justification for failing to hire the applicants was pretext—thus failing to meet its burden of producing evidence supporting an inference of discrimination. Def.'s Br. 13–17. Separately,

37

Celadon urges that summary judgment be granted on the basis of the individual claimants' failure to exhaust their administrative remedies. *Id.* at 18–20.

## A. Whether the six applicants were qualified for the position

A prerequisite to proving discrimination—under the direct and indirect method alike—is that the plaintiff must be a disabled individual who is qualified for job from which she was rejected for hire. 42 U.S.C. § 12111(8); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). To make a prima facie case, it is the plaintiff's burden to prove that she is qualified to perform the essential functions of the job she seeks, with or without reasonable accommodation. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 973 (7th Cir. 2000). Regulated employers like Celadon cannot employ drivers who have not produced a copy of a doctor's certificate indicating they are physically qualified for the position under DOT safety regulations. 49 C.F.R. §§ 391.11(a), 391.41(a)(1); *Bay,* 212 F.3d at 973. The six claimants here must therefore show that they met the requirements imposed by these DOT regulations, 49 C.F.R. § 391.41(b), in order to demonstrate that they were qualified job applicants. *Bay,* 212 F.3d at 973.

Celadon argues that the EEOC's burden here is a simple one: it must show that an applicant possessed a valid DOT certification at the time of her application—and if it has no such evidence, then there is no viable claim. Def.'s Br. 14–16. Certainly, proof of DOT certification is a powerful, straightforward means of making a prima facie case with respect to job qualification. *See, e.g., Gaspar*, 2013 WL 2355994, at *5. In fact, though, the issue is not quite so simple. As we have discussed, the ADA's statutory framework makes clear that while trucking companies may not *employ* drivers who have not received DOT certification, they may conditionally *hire* them pending examination and certification. *See* 42 U.S.C. § 12112(d)(2)–(3). Decisions within the Seventh Circuit—including those relied upon by Celadon—recognize the possibility that an

applicant may be qualified if she is able to pass muster under DOT regulations, even if she has

not yet received a certification at the time of her initial application.

For instance, Celadon cites the Seventh Circuit's pronouncement, in *Bay v. Cassens Transport Co.*, 212 F.3d 969 (7th Cir. 2000), that an employee's inability to obtain DOT certification from the company's doctor as "fatal to his ADA claim." *Bay,* 212 F.3d at 974. *Bay,* however, arose in a different context; there, an employee who had already been hired, and sought to return to work, lacked certification. Because the company "was not allowed to permit Bay to *resume* driving until he produced a copy of a doctor's certificate indicating he was physically qualified to drive," the court reasoned that his lack of certification was a proxy for lack of qualifications. *Id.* (emphasis added). In the case of applicants who have not yet been hired, where the ADA actively forbids employers from using medical examinations to screen applicants before they have been extended conditional offers, a more circumspect approach is appropriate. We believe that the court in *Prado,* a decision oft-cited by Celadon, enunciated the correct standard: "to become a 'qualified individual' under the ADA, . . . [a] driver[] must be DOT certified *or* be able to obtain DOT certification." 982 F. Supp. at 1307 (emphasis added). Even if an applicant has been expressly denied certification by medical staff in the wake of a DOT-mandated examination, the Seventh Circuit has cautioned that courts need not always take the denial as conclusive proof that the applicant was unqualified. "In cases where the doctor's disqualification decision is based on a condition not covered by DOT regulations . . . or where the plaintiff's lack of certification is used as a pretext for discrimination . . . or if an employer is working in collusion with a medical professional to deny certification, a plaintiff's lack of certification may not be decisive." *Bay,* 212 F.3d at 975. This makes ample sense: it would frustrate the purpose of the statute to allow an employer to subvert an ostensibly independent

medical certification process, then turn around and point to a claimant's lack of certification as a defense to a discrimination claim.

In contending that the six applicants were not qualified for the position, Celadon relies primarily on the affidavit of Community Health Medical Director Dr. Richard Hon, who was responsible for overseeing the staff that conducted DOT medical examinations on behalf of Celadon. Hon Decl. at ¶ 2. Based on his review of the attached Medical Examination Reports for each applicant, Dr. Hon avers that "none of the applicants identified above [including the six failure-to-hire claimants] passed their DOT-required medical examinations administered by Community on the date the examination was initiated." *Id.* at ¶ 7. We agree with Plaintiff that while Dr. Hon's testimony is probative, it is not necessarily conclusive of the applicants' qualification status. *Cf. Bay,* 212 F.3d at 975; *Prado,* 982 F. Supp. at 1307. It is particularly important to note what Dr. Hon did *not* say: he did not assert that any of the claimants failed their medical examinations (as opposed to failing to complete them), or that they were definitely deemed unfit to work as truck drivers pursuant to DOT regulations. *See* Hon Decl. at ¶¶ 4–8. We therefore proceed to examine the evidence relating to each individual applicant to determine whether a genuine issue of material fact exists.

### 1.  David Gasser

David Gasser's medical examination report shows that he was examined on September 3, 2008. Hon Decl. at ¶ 4; Hon Decl., Ex. 6. The examiner made a notation that Gasser should "avoid sedating meds while driving" and checked a box indicating that Gasser was required to wear corrective lenses. Where prompted to "note certification status," however, the examiner checked neither the box for "meets standards . . . qualifies for 2 year certificate" nor the box for "does not meet standards." Hon Decl., Ex. 6. Dr. Hon characterizes this report as "not completed

40

– not signed by Medical Examiner"; as noted above, he concludes that Gasser did not pass his examination, at least on the day it was initiated. Hon Decl. at ¶ 7.

The EEOC retorts that Mr. Gasser actually did receive a form of certification before nonetheless being denied employment. Pl.'s Br. 25–26. It points to a Celadon Medical Department "individual encounter" form, to which (it says) Nurse Melodie Gill added a notation on September 11, 2008: "Certify to drive x 1 year." Docket No. 141-2 (Fleming Dep.), Ex. 74. It further points to a Celadon medical release form that had apparently been returned by one of Mr. Gasser's treating doctors; in the margin at the bottom, Nurse Gill acknowledges making several handwritten notations, including "CMV [commercial motor vehicle] OK." Docket No. 141-1 (Gill Dep.) 40–41, Ex. 40. The EEOC also submits a sworn declaration from Mr. Gasser, in which he states that he underwent a physical examination on the first day of his Celadon orientation, but was later told he had not yet been issued a driving assignment because the medical department was still waiting on additional documentation from his physician. Docket No. 145-2 (Gasser Decl.) at ¶¶ 16–19, 22–23. He avers that, several days later, an unnamed nurse from Celadon's medical department told him over the phone that he had been certified. *Id.* at ¶ 25.

As Celadon notes, much of the evidence on which the EEOC relies here is problematic. The EEOC seeks to introduce the "individual encounter" form [Fleming Dep., Ex. 74] through the deposition testimony of Nurse Practitioner Nyla Fleming, a member of the Celadon medical staff. Nurse Fleming, however, testified that she did not make the notations, and that her initials appeared at various points on the form automatically because she was listed as the "examiner" for the patient; Fleming thus did not create the document and had no personal knowledge of it. *See* Fleming Dep. 49–50. Fleming stated that the writing was likely the work of fellow nurse

Melodie Gill; Nurse Gill, however, offered no testimony on the subject and her deposition did not mention the "individual encounter" document. *Id. See generally* Gill Dep. Supporting materials designed to establish issues of fact in opposing summary judgment "must be established through one of the vehicles designed to ensure reliability and veracity . . . . When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence." *Friedel v. City of Madison,* 832 F.2d 965, 970 (7th Cir. 1987). This document lacks authentication, and the statements therein are inadmissible hearsay to the extent they are offered for their truth. *See, e.g., Pryor v. Resort Condos. Int'l, Inc.*, 2000 WL 1006742, at *4–5 (S.D. Ind. July 19, 2000) (noting that comments from an unidentified source, even if asserted to come from a representative of the opposing party, do not fall within the hearsay exception at Rule 801(d)(2)).

As for the medical release form [Gill Dep., Ex. 40], Nurse Practitioner Melodie Gill, who was asked about it in her deposition, acknowledged that she had made handwritten notes at the bottom of the form, but stated that she did not recognize the handwriting of the person who had filled in the body of the form. Gill Dep. 40. The enigmatic handwritten annotation "CMV OK," even if it were not hearsay, is insufficient to allow a trier of fact to infer that Mr. Gasser was DOT certified or capable of being DOT certified. On its face, Gill's note appears to state only that a Dr. Joseph Sunny, who signed the release, was of the opinion that Mr. Gasser's depressive disorder would not interfere with his ability to operate a commercial motor vehicle. *See* Gill Dep., Ex. 40. The release form does not purport to establish that Mr. Gasser was qualified to receive DOT certification, and the only portions of it that the EEOC have attempted to authenticate are Nurse Gill's marginal notes.

Lastly, Mr. Gasser's own assertion that an unidentified person told him over the telephone that he was DOT certified, Gasser Decl. ¶ 25, is straightforwardly inadmissible hearsay. *See Vazquez v. Lopez-Rosario,* 134 F.3d 28, 34 (1st Cir. 1998) (hearsay statements by unknown individuals, even if proponent states that declarants were party opponents' employees, not subject to the Rule 801(d)(2) exclusion). Disregarding, as we must, the inadmissible portions of the EEOC's designated evidence, we find that the agency has not met its burden of demonstrating that Mr. Gasser was either DOT certified or able to obtain DOT certification at the time of his application. *Cf. Bay,* 212 F.3d at 973; *Prado,* 982 F. Supp. at 1307.

### 2.  Stephen Hudetts

Stephen Hudetts's medical examination report shows that he was examined on March 10, 2009. Hon Decl. at ¶ 4; Hon Decl., Ex. 10. The examiner stated that Mr. Hudetts was "temporarily disqualified," and stated that he needed an "audiogram/BPR." Hon Decl., Ex. 10. According to Hudetts, he received this temporary disqualification because he failed the "whisper test" administered during the medical exam; the audiogram is a follow-up test for those who fail the initial hearing screen. *See* Docket No. 145-3 (Hudetts Decl.) at ¶ 13; 49 C.F.R. § 391.43. The EEOC submits an "individual encounter form," dated on March 11, 2009—the day after his examination—stating that Mr. Hudetts was being given a follow-up examination for elevated blood pressure and had not yet undergone an audiogram. Docket No. 141-4. The EEOC also submits Mr. Hudetts's declaration, in which he recounts the aftermath of his examination as follows:

> The medical examiner then explained to me that I would need to take and pass an audiogram before medical certification could be issued. The examiner told me that I would be scheduled for an audiogram.

> I left the medical clinic and immediately went to see the recruiter who had worked with me through the application process.
>
> I reported the medical examiner's statements to the recruiter. The recruiter responded by telling me that there was no need for me to take a hearing test and that I was being dismissed from orientation.

Hudetts Decl. at ¶¶ 14–16.

Mr. Hudetts's recollection of what the Celadon recruiter told him is hearsay, but his statement that he was sent home from orientation without ever having completed the hearing test is admissible. *See Schmutte v. Resort Condos. Int'l, LLC,* 2006 WL 3462656, at *8 (S.D. Ind. Nov. 29, 2006) ("An out-of-court statement offered to establish [that] a statement was made and [that] it had an effect on the listener is not contrary to the general hearsay rule.") (citing *Foo v. Trustees of Ind. Univ.*, 88 F. Supp. 2d 937, 942 (S.D. Ind. 1999)). Coupled with his declaration that, at the time of his application to Celadon, he possessed a valid DOT certification,[24] Hudetts Decl. at ¶ 8, this is sufficient to support a fact-finder inference that he was qualified for the position, but was dismissed from the program before he could complete his medical examination and receive his certification. Celadon's evidence, particularly Dr. Hon's testimony, establishes that Mr. Hudetts did not receive certification from the Community Health staff on the first day of his orientation; neither the examination form nor Dr. Hon's testimony, however, states that Hudetts was *denied* a final certification. Hon Decl. at ¶¶ 4–8; Hon Decl., Ex. 10. Where the record supports an inference that an applicant who would have passed an examination was rejected before he could complete the examination, his lack of contemporaneous certification from the designated medical examiner is not conclusive of the question of his qualifications. *See Bay,* 212 F.3d at 975. Celadon is entitled to less deference to its reliance on outside medical

---

[24] Puzzlingly, the EEOC's briefs do not mention Hudetts's straightforward statement that he possessed a valid DOT certification.

opinions where Community Health evidently never reached a final certification decision—and where a reasonable fact-finder could determine that the employer simply aborted the examination process for reasons not connected to Community's medical advice. *See id.*; *Ragan v. Jeffboat, LLC,* 149 F. Supp. 2d 1053, 1071 (S.D. Ind. 2001) ("In sum, we do not say on summary judgment that Jeffboat *did not* rely in good faith on its doctors' opinions. We merely note that we cannot conclude as a matter of law that it *did.* Mr. Ragan has adduced enough legally probative evidence to show that there is a genuine issue of material fact as to that issue."). Issues of material fact thus foreclose a ruling as to Mr. Hudetts's eligibility under DOT certification requirements at the time of his application.

### 3.  William Smith

William Smith's medical examination report shows that he was examined on December 9, 2009. Hon Decl. ¶ 4; Hon Decl., Ex. 20. Like Hudetts, Smith was marked "temporarily disqualified" because he had failed the initial whisper test and therefore required an audiogram. Hon Decl., Ex. 20. Smith states that after he told his recruiter the results of the whisper test, he was sent home and rejected for the job without ever undergoing the audiogram that his Community Health exam form stated he needed to be certified. Docket No. 145-4 (W. Smith Decl.) at ¶ 2. Smith also states that, as part of his successful application to the J.B. Hunt Corporation two months after his dismissal from the Celadon orientation, he took—and passed— the audiogram as part of his DOT examination. W. Smith Decl. at ¶ 17. Smith's case is therefore analogous to Hudetts's; where Smith has presented evidence that he would have been found qualified had he been permitted to complete his examination, we will not treat the lack of a DOT certification from Community Health as conclusive of the question. *See Bay,* 212 F.3d at 975; *Ragan,* 149 F. Supp. 2d at 1071.

45

### 4. Harvey Landry

Harvey Landry's medical examination report shows that he was examined on January 13, 2009. Hon Decl. ¶ 4; Hon Decl., Ex. 12. Like Hudetts and William Smith, Mr. Landry was marked "temporarily disqualified"; in his case, however, the examiner stated that his file required medical releases from his psychiatrist(s) before he could be certified. Hon Decl., Ex. 12. According to Mr. Landry, he explained to the examiner, Nurse Practitioner Melodie Gill, that he could not comply with this requirement because he had never actually been treated by a psychiatrist. Docket No. 145-5 (Landry Decl.) at ¶ 11. He recounts that he planned to visit a psychiatrist in Indianapolis so that a release could be obtained and he could be certified before the orientation program was completed. *Id.* at ¶¶ 11–12. He states that he was sent home from orientation before he had had a chance to see a psychiatrist and obtain the necessary documentation. *Id.* at ¶ 13.

Mr. Landry's testimony may suffice to support an inference that his examination process was terminated before he had a chance to complete it, but neither his declaration nor any other evidence meets his prima facie burden of establishing that he was actually qualified for DOT certification at the time of his application. The EEOC's failure-to-hire claim on his behalf therefore fails. *Cf. Bay,* 212 F.3d at 973; *Prado,* 982 F. Supp. at 1307.

### 5. Patricia Kimbrell

Patricia Kimbrell's medical examination report shows that she was examined on April 7, 2008. Hon Decl. ¶ 4; Hon Decl., Ex. 11. Ms. Kimbrell's exam revealed a heart murmur, and she disclosed to the examining nurse that she had had a history of heart issues, including a surgery some 30 years before. Docket No. 145-6 (Kimbrell Decl.) at ¶ 8. The examiner marked her

"temporarily disqualified" and noted that she needed a "cardiology release" in order to be certified. Hon Decl., Ex. 11. In her declaration, Ms. Kimbrell states that because records from her surgery were so old, she expressed to the examiner her concerns that obtaining records and releases might not be possible. Kimbrell Decl. at ¶ 10. According to Ms. Kimbrell, she was dismissed from orientation immediately after meeting with personnel from Celadon's medical department that same day. *Id.* at ¶ 12.

As with Mr. Gasser and Mr. Landry, the EEOC has put forth no evidence sufficient to satisfy its burden of establishing that Ms. Kimbrell was qualified for the position—showing that Celadon cut her examination short, after all, is not the same as showing that she would have passed had she completed it. The EEOC's failure-to-hire claim on her behalf therefore fails. *Cf. Bay,* 212 F.3d at 973; *Prado,* 982 F. Supp. at 1307.

### 6. Haywood Glaze

Haywood Glaze's medical examination report shows that he was examined on October 19, 2011. Hon Decl. ¶ 4; Hon Decl., Ex. 7. Toni Wilcher, the nurse practitioner who conducted Mr. Glaze's examination, testified that his initial examination revealed the need for audiometric testing and a release from a cardiologist regarding a heart murmur. Docket No. 141-3 (Wilcher Dep.) at 85–87. Mr. Glaze later passed his audiometric exam. *Id.* at 86, Ex. 58. As of October 24, 2011, Community Health was in possession of 2009 EKG results from Mr. Glaze's doctor. *See* Wilcher. Dep., Ex. 61. Nurse Practitioner Wilcher testified that these test results, on their own, would not have satisfied the release requirement; she also testified that she was unable to read

the numbers on the report, and did not offer an opinion as to whether this test score would have satisfied the DOT heart-health requirements. *Id.* at 90–92.[25]

With respect to the claims of both Ms. Kimbrell and Mr. Glaze, the EEOC argues, essentially, that we should consider the two applicants qualified for purposes of summary judgment in light of the evidence that Celadon "colluded with the medical department to deny DOT certification to otherwise qualified individuals." Pl.'s Resp./Reply 32–33. But this puts the cart before the horse. It is the EEOC's burden to establish that claimants were qualified for the position they sought at the time of their application. Evidence that Celadon colluded with Community Health in imposing a release policy that went beyond DOT requirements may show that the lack of certification is not inherently "fatal" to the EEOC's claims as to these two applicants, *cf. Bay,* 212 F.3d at 974, but it does not help them meet their initial burden. Without any evidence at least creating an issue of fact that Mr. Glaze—who concededly had heart murmur issues triggering greater scrutiny DOT regulations—met the applicable DOT standards, the EEOC cannot make out a prima facie case that he suffered discrimination. Neither he nor Nurse Practitioner Wilcher testifies that he was qualified, or that he would have been certified had the process run its natural course. The failure-to-hire claim with respect to Mr. Glaze therefore fails as well.

We therefore determine that issues of material fact preclude summary judgment as to the qualification status of claimants Stephen Hudetts and William Smith, but that the EEOC has

---

[25] The EEOC misleadingly characterizes Wilcher's testimony as follows: "According to Toni Wilcher . . . an ejection fraction of 40% meets the DOT standards. A review of these results show [sic] that Mr. Glaze's ejection fraction was above 40%." Pl.'s Resp./Reply 31. The "review" of the document was apparently conducted by the EEOC's counsel. The Court agrees with Nurse Practioner Wilcher that the numbers on the form, at least as reproduced here, are not readable.

failed to meet its prima facie burden with respect to David Gasser, Harvey Landry, Patricia Kimbrell, and Haywood Glaze.

## B. Pretext

With respect to claimants Stephen Hudetts and William Smith, the EEOC has made an adequate prima facie showing that they were qualified to hold the position for which they applied, and would have been certified had Celadon allowed the examination procedure to take its course. Celadon's other asserted ground for summary judgment relates not to the prima facie case,[26] but to the adequacy of the EEOC's pretext showing.

Because it has never demonstrated that the truck driver positions for which the claimants were rejected were filled by non-disabled applicants, it evidently elects to proceed under the less structured "direct" method of proving discrimination. *Cf. Grigsby,* 628 F.3d at 358.

One means by which a plaintiff may build a "chain of inferences" of discriminatory intent is by demonstrating that the employer's stated reason for its adverse employment action was pretext—"where the plaintiff is qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008) (quoting *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 725 (7th Cir.1998)). *See also Weisbrot v. Med. Coll. of Wis.,* 79 F.3d 677, 682 (7th Cir. 1996) (quoting *Courtney v. Biosound, Inc.*, 42 F.3d 414, 424 n.4 (7th Cir. 1994)). Celadon's justification for its actions is a simple and consistent one; it contends that its failure to

---

[26] In its reply brief, Celadon notes that the EEOC has not established the nature of each applicant's "disability." Def.'s Reply 19 n.15. Celadon's argument on this point comes too late: a plaintiff generally does not need to devote space in its summary judgment response brief to addressing elements of its prima facie claim not challenged by the defendant's initial brief. *See Cloe v. City of Indianapolis,* 712 F.3d 1171, 1182 (7th Cir. 2013).

hire these applicants was solely a function of their failure to pass the physical examinations and their corresponding lack of DOT certification:

> The EEOC cannot refute that *none* of the failure to hire class members were able to pass the DOT physicals that were administered to them by Celadon's designated DOT medical exam provider, community Health, and thus did not receive required DOT medical certificates. Nor can the EEOC dispute that Celadon relied on those class members' inability to receive DOT medical certificates from Community Health as the *sole* basis for declining employment to those class members, or that Celadon has *never* hired a driver-applicant who was unable to receive a DOT medical certificate from Community Health.

Def.'s Br. 17 (citing Chesterman Decl. at ¶¶ 14–15) (emphasis original).

Pretext is simply "lie or a phony reason for taking an adverse action." *Perkins v. Gen. Elec. Capital Auto Fin. Servs., Inc.,* 6 Fed. App'x 320, 325 (7th Cir. 2001). "An otherwise legitimate excuse is not pretextual if it is foolish, trivial, or even baseless, so long as the decisionmaker honestly believed it when taking the adverse action." *Id.* (citing *Debs v. Ne. Ill. Univ.,* 153 F.3d 390, 396 (7th Cir.1998)). *See also Abioye v. Sundstrand Corp.*, 164 F. 3d 364, 368 (7th Cir. 1998) ("In demonstrating pretext, a plaintiff must show more than that the employer's decision was incorrect; the plaintiff must also show the employer lied about its proffered explanation.") (citing *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995)). Pretext may therefore be proved circumstantially, by showing that "(1) the defendant's explanation has no basis in fact, or (2) the explanation was not the 'real reason', or (3) ... the reason stated was insufficient to warrant the [failure to hire]." *Sanchez v. Henderson,* 188 F.3d 740, 746 (7th Cir. 1999).

Here, the EEOC alleges that rather than relying on the results of the DOT examination and certification process being conducted by Community Health staff, Celadon inserted itself into the process, turning away applicants whose certifications could not be completed on the first day of orientation for cost-savings reasons. The EEOC's primary piece of evidentiary support for

this contention is an email message from then-recruiting director Darryle Swartzlander, who

announced to members of Celadon's recruiting staff:

> In an effort to not waste time and money we are putting the following procedures
> in to effect immediately:
>
> . . .
>
> 3. Any applicant showing for class [orientation] that has failed to divulge medical
> information that would normally require a release before attending orientation
> will be sent home for falsifying their application and will not be eligible to return.

Swartzlander Dep., Ex. 27. Swartzlander acknowledges that he sent the email—and that the

message is an accurate statement of Celadon's policy as of March 2009, when it was sent;

however, he maintains that the policy actually originated with the vice president of safety,

William Osborn, rather than his own recruiting department. *Id.* at 105. Whether originating with

Osborn or Swartzlander, such a policy came from a person with decision-making authority in the

company, and it is sufficiently at variance with Celadon's stated position as to call its veracity

into question. *See Lawhead v. Ceridian Corp.*, 463 F. Supp. 2d 856, 863 (N.D. Ill. 2006) (citing

*Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004)).

Although temporal sequence is not a "magic formula," the "suspicious timing" of an

employer's actions may also give rise to an inference of pretext—or of discrimination more

generally. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506–507 (7th Cir. 2004). Both Hudetts

and Smith aver that they were sent home from orientation immediately after informing Celadon

recruiting staff that they had medical conditions requiring additional steps before certification.

Hudetts Decl. at ¶¶ 14–16; Smith Decl. at ¶ 2.[27] *See generally Harper v. C.R. England, Inc.*, 687

---

[27] The EEOC also calls our attention to the fact that one of Hudetts's "individual encounter" forms, in addition to
those of several other applicants on whose behalf EEOC charges had been filed, was altered on September 29,
2009—more than six months after Mr. Hudetts attended orientation and was sent home. Nurse Practitioner Melodie
Gill added a notation that Mr. Hudetts "needs BP [blood pressure] recheck." Gill Dep. 78–79, Ex. 93. The EEOC
suggests that these alterations are reflect Celadon-directed tampering with old records once EEOC charges had

F.3d 297, 308 (7th Cir. 2012) (in the context of retaliation, noting that a close temporal link between an employer's awareness of protected status and adverse action may qualify as "suspicious," when accompanied by other evidence). When viewed in conjunction, we believe that these pieces of evidence warrant an inference that Celadon was intervening in the process in an effort to avoid "wast[ing] time and money." Swartzlander Dep., Ex. 27. *See Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) (finding that evidence of pretext and suspicious timing, together, warranted denial of summary judgment). These factors may allow a fact-finder to infer that Celadon dismissed certain disabled applicants based on an improper, discriminatory motive. *See Dass v. Chi. Bd. of Educ.,* 675 F.3d 1060, 1071 (7th Cir. 2012) (citations omitted) (noting that evidence under the direct method "must point directly to a discriminatory reason for the employer's action ... and be directly related to the employment decision.")

Celadon objects that "the EEOC fails to cite *any testimony or evidence from any Celadon employee* regarding any of the specific hiring decisions for any of its class members." Def.'s Reply 19 (emphasis original). But despite the direct method's name, it does not require the EEOC to produce "direct" evidence that each individual act was motivated by animus—a convincing mosaic of circumstantial evidence may suffice. *See Coleman,* 667 F.3d at 860. Celadon also protests that the company's employees were not aware of any of the applicants' specific health information, which was handled by the Community Health examiners. The individual plaintiffs' testimony and the evidence of Celadon's "time and money"-saving policy, however, belie the notion of a veil of ignorance separating the two groups. Hudetts and Smith testify that they were sent home shortly after informing Celadon recruiting staff members—not

_____

brought them into controversy. In the absence of any evidence that Celadon directed Nurse Gill or anyone else to alter the records, however, we do not believe such an inference is warranted.

Community Health medical examiners—that their respective certification processes were incomplete. *See* Hudetts Decl. at ¶¶ 14–16**;** Smith Decl. at ¶ 2

The EEOC has shown that, at least as of March 2009, Celadon had a policy of sending home applicants who had failed to disclose medical issues requiring releases—in other words, for failing to conform to a Celadon medical release policy that, as we have already noted, did not conform entirely to DOT requirements. *See* Swartzlander Dep., Ex. 27; Fleming Dep., Ex. 16 at 3. This undermines Celadon's position regarding the independence and authoritativeness of the DOT certification process; the applicants' testimony additionally points to a suspicious temporal link between Celadon's awareness of the need for additional procedures and the abrupt termination of their applications. The EEOC has done just enough to produce circumstantial evidence of discriminatory intent at this stage, allowing the EEOC's pretext claim to survive.

## C. Failure to Exhaust

As a separate argument for summary judgment on all of the failure-to-hire claims, Celadon insists that the applicants' failure to exhaust their DOT administrative remedies should foreclose them from challenging their certification status. Def.'s Br. 18–20.

DOT regulations provide a framework for job applicants to pursue administrative appeals of medical certification decisions made by DOT-registered medical providers. 49 C.F.R. § 391.47. In order to initiate the process, the applicant must, among other things, "submit proof that there is a disagreement between the physician for the driver and the physician for the motor carrier concerning the driver's qualifications." *Id.* at § 391.47(b)(2). A number of courts have held that this provision creates an exhaustion requirement, barring a plaintiff from adjudicating "driver fitness issues" in federal court before availing himself of this administrative remedy. *See*

*generally Reiter v. Cooper,* 507 U.S. 258, 269 (1993) ("Where relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts....")

Celadon brings to our attention three cases in particular: two district court decisions within the Seventh Circuit, and one Eighth Circuit opinion. In the now-familiar *Prado* case, a job applicant underwent a DOT physical examination, and the examining doctor found him unfit to be a truck driver because his "left leg was atrophied with very limited function." 982 F. Supp. at 1306. The court found that the plaintiff had failed to exhaust his administrative remedies, and was therefore barred from challenging the doctor's DOT certification decision in federal court:

> It is undisputed that Prado failed to pursue his administrative remedies under 49 C.F.R. § 391.47 before filing his complaint with the court. The court will not abrogate clear congressional intent which vests driver fitness issues in the Secretary of Transportation. 42 U.S.C. § 31136(a)(3). Nor will the court usurp the power of the OMCRS to determine whether a physician's examination procedures were flawed or conclusions erroneous. 49 C.F.R. § 391.47; *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 206, 114 S.Ct. 771, 775–76, 127 L.Ed.2d 29 (1994) (precluding initial judicial review where Congress intends an administrative body be the original arbiter of a controversy). Therefore, Prado is precluded from arguing those issues before the court.

*Id.* at 1308. The Northern District of Illinois reached a similar conclusion in *Gaspar v. DS Waters of America,* 2013 WL 2355994 (N.D. Ill. May 22, 2013). There, a returning employee alleged that his employer discriminated against him by obliging him to undergo a complicated re-certification process, even though his family doctor had been willing to give him a DOT certification from the outset. 2013 WL 2355994, at *4. The court found that the plaintiff should have attempted to resolve these conflicting medical opinions through the DOT administrative process before bringing suit. *Id.* at 6 (citing *Prado,* 982 F. Supp. at 1308). In *Harris v. P.A.M. Transportation, Inc.,* 339 F.3d 635 (8th Cir. 2003), the Eighth Circuit likewise held that an exhaustion requirement applied: "The DOT is charged with and is much better equipped to

54

handle resolution of disputes over a driver's medical qualifications and can do so far more expertly and efficiently than a reviewing court. Thus, we hold that failure to exhaust the remedies available under 49 C.F.R. § 391.47 requires dismissal of this action." 339 F.3d at 638.

We agree with Celadon that the availability of an administrative remedy imposes an exhaustion requirement, but we conclude that the procedure prescribed by 49 C.F.R. § 391.47 is inapplicable to this case. As we have noted, one of the prerequisites to an administrative appeal is the existence of two (or more) conflicting *medical* opinions: a plaintiff must "submit proof that there is a disagreement between the physician for the driver and the physician for the motor carrier concerning the driver's qualifications." 49 C.F.R. § 391.47(b)(2). In each of the cases cited by Celadon, an administrative remedy would have been available because a choice between conflicting opinions existed—and there was an explicit denial of certification susceptible to challenge. In *Gaspar,* the court acknowledged that the existence of such a conflict is fundamental to the administrative remedy, though it rejected the plaintiff's argument that no exhaustion requirement applied:

> Gaspar argues he could not raise a dispute to the Administration because he did not have two conflicting medical evaluations. This argument lacks merit. A conflict existed between Dr. Koehler's denial and Dr. Osten's grant of DOT certification. Gaspar contends he was qualified to resume work after he received DOT certification from Dr. Osten and Dr. Pappas. He overlooks Dr. Koehler's earlier denial of DOT certification and Dr. Mehta's initial conclusion further testing was necessary to ascertain whether he was able to safely operate a commercial vehicle. Gaspar's ADA claim challenges Dr. Koehler's and Dr. Mehta's medical conclusions and the procedures used to conduct their evaluation, particularly Dr. Koehler's decision to revoke DOT certification based on Gaspar's prescription medications without personally examining him.

2013 WL 2355994, at *6. Likewise, in *Harris,* an identifiable conflict existed between two medical evaluations—one from the outside contractor recommending certification, and one from

55

the company's own medical director, denying certification based on review of the records. 339

F.3d at 637.

Here, by contrast, the EEOC does not ask us to resolve any such conflict of medical

judgment. Celadon has not established that Community Health reached a final certification

decision with respect to any of the failure-to-hire claimants; the examination forms Celadon has

submitted are incomplete, and at most state that an applicant is "temporarily disqualified"

pending the arrival of releases or the completion of further tests. *See* Hon Decl., Exs. 6–7, 10–12,

20. The EEOC contends that Celadon recruiters intervened to short-circuit the DOT examination

and certification process for these applicants before it could be completed, depriving Community

Health of the opportunity to approve or deny the certifications. The exhaustion requirement

derives from the "clear congressional intent which vests driver fitness issues in the Secretary of

Transportation," *Prado,* 982 F. Supp. at 1307–1308 (citing 42 U.S.C. § 31136(a)(3)), and the

recognition that the DOT is "much better equipped to handle resolution of disputes over a

driver's medical qualifications and can do so far more expertly and efficiently than a reviewing

court." *Harris,* 339 F.3d at 638. These rationales are not implicated when the plaintiff alleges

that the challenged decision was an administrative one independent of good-faith reliance on

expert medical opinions—and that there is no contrary medical determination to submit to the

DOT's review. *Cf. Bay,* 212 F.3d at 975 n.2 ("In cases where a company does act reasonably and

in good faith, an employee can resort to administrative procedures for resolving medical disputes

under 49 [C.F.R.] 391.47.").  We therefore conclude that the EEOC's claim here is not barred by

the individual claimants' failure to exhaust their administrative remedy.

**D. Conclusion**

We have found that the EEOC has met its prima facie burden for its failure-to-hire claim with respect to two of the six claimants: Stephen Hudetts and William Smith. Because we have additionally found that the claims are not barred by failure to pursue DOT administrative remedies, Celadon's motion for summary judgment with respect to Stephen Hudetts and William Smith is DENIED. The company's motion with respect to David Gasser, Harvey Landry, Patricia Kimbrell, and Haywood Glaze is GRANTED.

### III.    The EEOC's conciliation efforts

Celadon asserts, as an independent ground for summary judgment, that the EEOC acted in bad faith in the course of its mandatory "conciliation" discussions with Celadon, and that the agency's claims should therefore be barred.[28] Def.'s Br. 40–41.

Title VII of the Civil Rights Act, whose enforcement provision the ADA incorporates by reference, requires that, if it finds reasonable cause to believe that an unlawful employment practice exists, the EEOC must "endeavor to eliminate [the] alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000-e(b). If, after engaging in this process, "the Commission has been unable to secure from the respondent a conciliation agreement" acceptable to the agency, then it may sue the employer. *Id.* at § 2000e-5(f)(1).

In *EEOC v. Mach Mining, LLC,* 738 F.3d 171 (7th Cir. 2013), the Seventh Circuit held that the EEOC's purported failure to fulfill this "conciliation" requirement is not a viable defense to an agency lawsuit. It cited three primary bases for this conclusion: that the statute's

---

[28] Although the misconduct alleged by Celadon concerns the EEOC's representations about the larger class of unlawful inquiry claimants, a finding that the EEOC violated a justiciable "failure to conciliate" standard would undermine both its unlawful inquiry and failure-to-hire enforcement actions. *See* 42 U.S.C. § 2000e-5(b).

language—i.e. "*endeavor* to conciliate"—embodied a high level of deference to the EEOC; that the provision provided the courts with no manageable standards upon which to ground judicial review; and that judicial review would functionally undermine the good-faith conciliation process the statute intended to facilitate. *See* 738 F.3d at 174–180. The Supreme Court recently reversed, and held that courts may review the EEOC's conciliation efforts, albeit on exceedingly narrow grounds. *Mach Mining, LLC v. EEOC,* 135 S. Ct. 1645 (2015). Because the standard enunciated by the Supreme Court is so new, it is best to let the Court's words speak for themselves:

> [T]he proper scope of judicial review matches the terms of Title VII's conciliation provision . . . . The statute demands . . . that the EEOC communicate in some way (through "conference, conciliation, and persuasion") about an "alleged unlawful employment practice" in an "endeavor" to achieve an employer's voluntary compliance. § 2000e–5(b). That means the EEOC must inform the employer about the specific allegation, as the Commission typically does in a letter announcing its determination of "reasonable cause." Such notice properly describes both what the employer has done and which employees (or what class of employees) have suffered as a result. And the EEOC must try to engage the employer in some form of discussion (whether written or oral), so as to give the employer an opportunity to remedy the allegedly discriminatory practice. Judicial review of those requirements (and nothing else) ensures that the Commission complies with the statute. At the same time, that relatively barebones review allows the EEOC to exercise all the expansive discretion Title VII gives it to decide how to conduct conciliation efforts and when to end them. And such review can occur consistent with the statute's non-disclosure provision, because a court looks only to whether the EEOC attempted to confer about a charge, and not to what happened (*i.e.,* statements made or positions taken) during those discussions.

135 S. Ct. at 1655–1656 (internal citations omitted).

Here, Celadon alleges that the EEOC did not conciliate in good faith—specifically, that its counsel misrepresented to Celadon whether the agency had medical certifications on hand for each of the class members for the unlawful inquiry claim. *Compare* Docket No. 132-9 (Williams

Dep.) at 65–69, 71–85, 87–111, 124–127, 129–130, 167, 169 *with* Williams Dep., Exs. 27–28.[29]

Celadon also ascribes to bad faith the fact that, after conciliation, the EEOC dropped a number of

the original class members and added others. Def.'s Br. 41 (citing Pryzbylski Decl. at ¶¶ 4, 6).

Regardless of whether Celadon's accusations are true, they fall outside the bounds of the narrow

"failure to conciliate" defense as described by the Supreme Court. The EEOC fulfilled the first

criterion of this deferential standard by issuing Celadon written notices describing "both what the

employer has done and which employees (or what class of employees) have suffered as a result."

*Cf.* 135 S. Ct. at 1655–1656. The EEOC's letters of determination with respect to the then-class

members are in the record; each charges that the company "conducted a pre-job offer medical

inquiry and physical examination on the Charging Party and a class of similarly situated

applicants"—along with other allegations—and each states that "the Commission shall endeavor

to eliminate the unlawful employment practice by informal methods of conciliation."[30] *See*

Williams Dep., Exs. 2–26. The letters of determination were attached to letters sent by the EEOC

to Celadon's counsel promising that "we will begin working with you to resolve this matter

promptly with the Charging Party through the conciliation process." *Id.* Letters and memoranda

in the record also reflect that the EEOC did, in fact, "engage[] the employer in some form of

---

[29] The parties dispute the extent to which the deposition testimony of Byron Williams, an EEOC attorney who represented the agency during its conciliation efforts, establishes that he misled Celadon about the medical certification status of the class members. *See* Def.'s Br. 40–41; Pl.'s Resp./Reply 37–38.

[30] Celadon also argues that "the EEOC's failure to conciliate on behalf of the 'new' fifteen class members it has added since this litigation began warrants the dismissal of those class members' claims." Def.'s Br. 41 (citing *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 677 (8th Cir. 2012)). We do not agree that a separate conciliation process was required for these "new" charging parties, since they were allegedly victims of the same application policy as the "original" class members—a policy which Celadon fully acknowledges it applied to *all* its job applicants during the time period in question. Celadon has not alleged that the EEOC used its initial charges as a mere "fishing expedition" to recover what it was really looking for. *Cf. CRST Van Expedited,* 679 F.3d at 676–677. Nor could the changing membership of the class plausibly have caused any uncertainty for Celadon regarding the nature of its charged misconduct and "which employees (or what *class of employees*) ha[d] suffered as a result." 135 S. Ct. at 1655–1656 (emphasis added). *Cf. EEOC v. GNLV Corp.*, 2015 WL 3467092, at *7 (D. Nev. June 1, 2015) (determining that conciliation was inadequate, even under *Mach Mining* standard, where employer was "unaware of [one type of] allegations at the time of the negotiations").

discussion (whether written or oral)." 135 S. Ct. at 1656. This evidence indicates that conciliation discussions in May–July of 2011 foundered on a number of issues, including the amount of recovery the EEOC sought and Celadon's contention that members of the claimant class were not "otherwise qualified" to serve as truck drivers. *See* Williams Dep. Exs. 29–32.

The Supreme Court has specified that judicial review is to be limited to these two requirements—"and nothing else." 135 S. Ct. at 1656. Celadon does not assert that it was misinformed as to the nature of the violations of which it was accused, nor does it deny that it engaged in conciliation discussions with the EEOC. Our "barebones" review of the conciliation process ends there. *Id.*

## IV.   Punitive Damages

In its cross motion for summary judgment, Celadon argues that, even assuming the company is found to have violated the ADA in some respect, the EEOC is not entitled to punitive damages. Celadon listed three grounds for its argument: that Celadon did not act with "malice or reckless indifference" towards class members' federally-protected rights, *cf.* 42 U.S.C. § 1981a(b)(1); that Celadon made good faith efforts to comply with the ADA, *cf. Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 534, 544–546 (1999); and that punitive damages are not available for pattern-or-practice claims brought pursuant to Section 707. Def.'s Br. 38–39.

The EEOC's response discusses the question of punitive damages in limited fashion— mentioning them as one of several bases for a finding that the agency has suffered an "injury in fact" supporting its Section 707 claim. *See* Pl.'s Resp./Reply 12.[31] In doing so, it addresses the

---

[31] Citations to "Pl.'s Resp./Reply" refer to the "EEOC's Combined Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment on Liability and Response in Opposition to Defendant's Summary Judgment Motion" [Docket No. 144].

availability of punitive damages only as an abstract legal question, failing entirely to come to grips with the three arguments that the EEOC presented in its motion for summary judgment. *Id.*

It is a "well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 389 (7th Cir. 2012) (quoting *Liberles v. Cook Cnty.*, 709 F.2d 1122, 1126 (7th Cir. 1983)). Therefore, "[i]f a party fails to properly oppose an argument raised in a motion for summary judgment, the claim is deemed waived and the non-moving party will lose the motion." *Rabe v. United Air Lines, Inc.*, 971 F. Supp. 2d 807, 820 (N.D. Ill. 2013). Celadon devotes an entire demarcated section of its brief in support of summary judgment to arguments against the EEOC's entitlement to punitive damages, and the EEOC's response fails to address any of Celadon's three arguments. The EEOC has accordingly abandoned its claim for punitive damages on either its unlawful inquiry or failure-to-hire theories.

## Conclusion

For the foregoing reasons, we resolve the parties' cross motions for summary judgment as follows:

With respect to the EEOC's pattern-or-practice unlawful inquiry and medical examination claim under 42 U.S.C. § 12112(d)(2), the EEOC's motion for summary judgment GRANTED in part, and we DECLARE that Celadon's pre-offer medical examination requirement, the first medical question on its application form, and its non-tailored surgery medical release requirements violate the Americans with Disabilities Act. The EEOC's motion for summary judgment is DENIED in part—and Celadon's cross motion for summary judgment

is correspondingly GRANTED in part—as to the other features of Celadon's application process.

Celadon's motion for summary judgment is DENIED in all other respects.

With respect to the EEOC's failure-to-hire claim, Celadon's motion for summary judgment is GRANTED as to David Gasser, Harvey Landry, Patricia Kimbrell, and Haywood Glaze, and DENIED as to Stephen Hudetts and William Smith.

IT IS SO ORDERED.

Date:      06/30/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

David J. Pryzbylski
BARNES & THORNBURG LLP
dpryzbylski@btlaw.com

R. Anthony Prather
BARNES & THORNBURG LLP (Indianapolis)
tony.prather@btlaw.com

Aarika D. Mack-Brown
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
aarika.mack-brown@eeoc.gov

Laurie A. Young
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
legal.station@eeoc.gov

Michelle  Eisele
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
michelle.eisele@eeoc.gov

Miles Ezekiel Shultz
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
miles.shultz@eeoc.gov